# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |
|---|---|
| DEKA INVESTMENT GMBH, DEKA INTERNATIONAL S.A. LUXEMBURG, and INTERNATIONAL FUND MANAGEMENT S.A., | Case No.: |
| *Plaintiffs*, | |
| v. | |
| BP p.l.c., BP AMERICA INC., BP EXPLORATION & PRODUCTION INC., ANTHONY B. HAYWARD, DOUGLAS J. SUTTLES, BYRON E. GROTE, H. LAMAR McKAY, and ROBERT W. DUDLEY; | |
| *Defendants*. | |

# COMPLAINT

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ........................................................................ 7

III.    PARTIES ............................................................................................................ 8

        A.     PLAINTIFFS ........................................................................................... 8

        B.     DEFENDANTS ....................................................................................... 9

IV.     FACTUAL BACKGROUND ............................................................................ 12

        A.     BACKGROUND ON BP ......................................................................... 12

        B.     BP EXPERIENCES A SERIES OF HIGH-PROFILE SAFETY INCIDENTS,
               INCLUDING A DEADLY EXPLOSION AT ITS TEXAS CITY REFINERY .. 13

        C.     BP ASSUAGES INVESTOR CONCERNS BY PLEDGING TO INSTITUTE
               THE BAKER GROUP'S SAFETY REFORMS ACROSS THE COMPANY'S
               OPERATIONS ......................................................................................... 16

        D.     TOP BP MANAGEMENT KNEW THAT IN CONTRAST TO THEIR
               PUBLIC REPRESENTATIONS, OMS DID NOT APPLY TO ALL BP
               OPERATIONS IN A UNIFORM MANNER ........................................... 21

        E.     BP MANAGEMENT WAS AWARE OF THE CHRONIC SHORTCOMINGS
               IN BP'S PROCESS SAFETY SYSTEMS ............................................. 30

        F.     BP RETALIATED AGAINST WHISTLEBLOWERS WHO RAISED
               SAFETY CONCERNS ............................................................................ 32

        G.     THE *DEEPWATER HORIZON* DISASTER REVEALS THE INCOMPLETE
               SCOPE AND INADEQUATE APPLICATION OF BP'S SAFETY
               REFORMS ............................................................................................... 36

        H.     DEFENDANTS PUBLICLY MISREPRESENT THEIR ESTIMATES OF
               THE SPILL'S VOLUME ......................................................................... 48

        I.     BP PLEADS GUILTY TO CIVIL CHARGES REGARDING ITS POST-
               SPILL OIL FLOW ESTIMATES ............................................................. 54

        J.     BP PLEADS GUILTY TO CRIMINAL CHARGES FOR MISLEADING
               CONGRESS, ENVIRONMENTAL POLLUTION AND FELONY
               MANSLAUGHTER ................................................................................. 55

V.  DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS.................................................................................................... 57

 A.  NOVEMBER 7, 2007 SPEECH ......................................................... 58

 B.  FEBRUARY 22, 2008 ANNUAL REVIEW ........................................ 58

 C.  FEBRUARY 27, 2008 CONFERENCE CALL STATEMENTS........................ 59

 D.  APRIL 17, 2008 SPEECH .................................................................. 60

 E.  DECEMBER 17, 2008 SPEECH ......................................................... 61

 F.  FEBRUARY 24, 2009 ANNUAL REVIEW ........................................ 62

 G.  MARCH 4, 2009 ANNUAL REPORT.................................................. 63

 H.  APRIL 16, 2009 SUSTAINABILITY REVIEW.................................... 65

 I.  FEBRUARY 26, 2010 ANNUAL REVIEW ........................................ 66

 J.  MARCH 5, 2010 ANNUAL REPORT.................................................. 67

 K.  MARCH 23, 2010 SPEECH ............................................................... 69

 L.  APRIL 15, 2010 SUSTAINABILITY REVIEW.................................... 69

 M.  APRIL 24, 2010 UNIFIED COMMAND ANNOUNCEMENT ........................ 70

 N.  APRIL 27, 2010 EARNINGS CALL ................................................... 72

 O.  APRIL 28-29 2010 PRESS STATEMENTS ........................................ 74

 P.  APRIL 29-30 SEC FILINGS ............................................................. 75

 Q.  MAY 4, 2010 SEC FILING............................................................... 77

 R.  MAY 5, 2010 PRESS STATEMENT.................................................... 77

 S.  MAY 14, 2010 PRESS STATEMENTS ............................................... 78

 T.  MAY 17, 2010 PRESS STATEMENT.................................................. 79

 U.  MAY 19, 2010 CONGRESSIONAL STATEMENT ............................... 80

 V.  MAY 21, 2010 PRESS STATEMENTS ............................................... 82

 W.  MAY 22, 2010 PRESS STATEMENTS ............................................... 83

VI.  DEFENDANTS ACTED WITH SCIENTER .................................................. 84

A.     HAYWARD .................................................................................................... 84

B.     SUTTLES ...................................................................................................... 86

C.     DUDLEY ...................................................................................................... 87

D.     GROTE ......................................................................................................... 87

E.     MCKAY ........................................................................................................ 88

F.     BP ................................................................................................................. 88

VII.    LOSS CAUSATION ................................................................................................ 89

VIII.   PLAINTIFFS RELIED ON DEFENDANTS' MISREPRESENTATIONS TO THEIR
DETRIMENT ........................................................................................................... 92

A.     PLAINTIFFS RELIED ON DEFENDANTS' PRE-SPILL
MISREPRESENTATIONS REGARDING SAFETY REFORMS ...................... 93

B.     PLAINTIFFS RELIED ON DEFENDANTS' POST-SPILL
MISREPRESENTATIONS REGARDING THE SIZE OF THE SPILL ............. 94

IX.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE
ARE INAPPLICABLE ............................................................................................. 95

X.     CAUSES OF ACTION ........................................................................................... 96

COUNT I  FOR COMMON LAW FRAUD WITH REGARD TO BP ORDINARY SHARES
AGAINST ALL DEFENDANTS ..................................................................... 96

COUNT II  FOR VIOLATIONS OF THE FINANCIAL SERVICES AND MARKETS ACT
2000 WITH REGARD TO BP ORDINARY SHARES AGAINST BP .......................... 98

PRAYER FOR RELIEF ....................................................................................................... 100

JURY TRIAL DEMANDED ................................................................................................ 100

1.      Plaintiffs Deka Investment GmbH, Deka International S.A. Luxemburg, International Fund Management S.A. (collectively, the "Plaintiffs"), by their attorneys, Grant & Eisenhofer P.A., bring this action pursuant to the common law and Section 90A of the Financial Services and Markets Act 2000 .  This action is brought against Defendants BP p.l.c. ("BP"), BP America Inc., BP Exploration & Production Inc., Anthony B. Hayward, Douglas J. Suttles, Byron E. Grote, Robert W. Dudley, and H. Lamar McKay (collectively, the "Defendants").

2.      Plaintiffs make the allegations in this Complaint based upon personal knowledge as to matters concerning Plaintiffs and their own acts, and upon information and belief as to all other matters.  This information is derived from the investigation by Plaintiffs' counsel, which has included a review and analysis of annual reports and publicly filed documents, media reports, publicly-filed litigation documents, and numerous civil and criminal investigations by other federal and state governmental units, as well as press releases, news articles, analysts' statements, conference call transcripts and presentations, and transcripts from speeches and remarks given by Defendants. Based on the foregoing, Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein, which Plaintiffs will find after a reasonable opportunity for discovery.

## I.      INTRODUCTION

3.      This action revolves around BP's serial misrepresentations regarding (1) its supposed implementation of critical process safety reforms to its operations worldwide and (2) the extent of the environmental damage caused by the April 20, 2010 *Deepwater Horizon* disaster, and the harms that these misrepresentations caused to Plaintiffs as purchasers of BP securities.

4.      Between 2002 and 2005, BP experienced a series of serious incidents at its facilities in the United States and around the world.  These included two gas blowouts on an oil

drilling rig in the Gulf of Mexico in 2002.  In 2003, a drilling rig in the North Sea suffered a gas blowout that did not ignite.  In 2004, another gas blowout occurred on a drilling rig off the coast of Egypt, and there the gas cloud exploded and burned for more than a week.  This series of safety mishaps culminated in a catastrophic explosion at BP's Texas City, TX refinery on March 23, 2005.  The Texas City blast killed 15 BP workers and injured more than 170.

5.      Realizing that its credibility needed to be revived in the wake of the Texas City disaster, BP announced a series of specific, high-profile reforms that it pledged to implement in order to transform itself into a leader in industrial safety.  BP began by commissioning an independent investigative panel, chaired by former Secretary of State James Baker, to review the causes of the Texas City disaster, and to recommend improvements to BP's safety practices.

6.      In January 2007, the Baker panel issued a report (the "Baker Report"), which traced the root causes of the Texas City disaster to BP's ill-considered decision to prioritize personal safety (e.g., use of safety harnesses) over process safety (e.g., designing, maintaining and operating facilities in a manner that would prevent serious accidents from occurring).  To rectify this problem, the Baker Report issued ten recommendations to improve process safety at BP's U.S. refineries.

7.      When the Baker Report was made public, BP immediately promised to implement its recommendations not only at its U.S. refineries, but at all of its work sites worldwide.  The day the Baker Report was issued, BP's then-CEO Lord John Browne presented a chastened face to the world, stating "BP gets it, and I get it too. . . . I recognise the need for improvement."  He promised that BP would undertake "a sustained group-wide effort to move BP towards excellence in process safety."

8.      Shortly after succeeding Browne as BP's CEO in May 2007, defendant Tony Hayward likewise promised to "focus on safety like a laser."  In particular, Hayward announced the creation of BP's Operating Management System ("OMS"), which was to be the mechanism for implementing the Baker Report's recommendations at all of BP's sites worldwide. Defendants presented the OMS as "a framework for operations across BP that is integral to improving safety and operating performance in every site," and repeatedly touted the scope of its implementation in investor reports, speeches, and SEC filings.  Hayward and BP pronounced that the OMS reforms had been implemented in BP's Gulf of Mexico operations by the end of 2008.

9.      These representations were material to Plaintiffs and other investors who were concerned about BP's safety record and the attendant risks that it caused the company.  By offering repeated assurances that BP had implemented the Baker Report's recommendations and OMS, BP convinced investors that it had turned a corner on this important issue, thereby increasing the price of its publicly-traded securities.  However, these representations were a campaign of deliberate misrepresentation designed to lull investors, regulators, and the general public into a false sense of security.

10.      Defendants hid from the public the fact that, as a matter of formal policy, BP did not intend to implement the process safety aspects of OMS on any of the offshore rigs it operated, unless BP also owned the rig outright – notwithstanding the fact that BP would remain liable for the consequences of safety lapses at operated, but not fully-owned facilities.  At the time, BP operated seven deepwater rigs in the Gulf of Mexico, but owned only one of them outright.  In other words, BP had made a decision to largely exempt most of its *actual* Gulf of Mexico operations – for which it would be liable for safety issues – from OMS.  Yet in its public SEC filings, which Hayward reviewed and signed, BP represented to regulators and investors

that it had fully implemented the OMS reforms in numerous regions, including its operations in the Gulf of Mexico.

11.     To monitor the implementation of OMC, Hayward created and chaired the Group Operations Risk Committee ("GORC").  As GORC chairman, Hayward had comprehensive, real-time reporting of safety issues from all of BP's managers.  Moreover, as BP's CEO, Hayward had the power to demand investigation of reported safety risks, to suspend operations until any such risks were rectified, and to allocate resources and personnel in a way that assured speedy and rigorous implementation of the safety reforms he promised.  Through chairing GORC, Hayward had first-hand knowledge that OMS had not been implemented in the Gulf of Mexico.

12.     On April 20, 2010, the offshore drilling rig *Deepwater Horizon*, leased and operated by BP, was completing a newly-drilled well located a mile below the surface of the Gulf of Mexico.  As it was doing so, a geyser of drilling mud abruptly shot up the riser pipe connecting the rig to the undersea well site, followed by a cloud of oil and natural gas.  The natural gas enveloped the *Deepwater Horizon* and then exploded, and the rig burned for two days straight, until it sank.  Eleven crew members died, and many more were injured.

13.     As the *Deepwater Horizon* sank, it critically damaged the undersea pipes at the well site.  It soon became evident that oil was escaping from the well, deep below the surface of the Gulf.  By the time BP was finally able to seal the well, three months had passed and more than 206 million gallons of oil had fouled the Gulf of Mexico.  It was by far the largest oil spill in U.S. history.

14.     Once the world was able to comprehend the human and ecological cost of this disaster, the financial repercussions followed.  By June 14, 2010, BP's stock was worth barely

4

half what it had been on April 20, 2010.  The total loss to investors was more than 90 billion dollars.

15.     In the investigations that followed the *Deepwater Horizon* disaster, it was revealed that BP's safety practices had actually changed little in the years following the Baker Report.  The National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (the "Presidential Commission") issued an investigative report in which it found that BP's "approach to managing safety has been on individual worker occupational safety but not on process safety. . . . [T]he company does not have consistent and reliable risk-management processes – and thus has been unable to meet its professed commitment to safety."  The same criticism had been central to the Baker Report years earlier.

16.     The unmistakable conclusion, discussed in detail below, is that BP deliberately misrepresented the scope and progress of its post-Baker Report process safety reforms company-wide.  It did this because it wanted to maintain the public pretense of having reformed itself in the wake of the Texas City disaster and numerous other mishaps, but did not want to commit the resources to actually do so.   The *Deepwater Horizon* disaster vividly illustrated that notwithstanding BP's professed commitment to process safety, when BP was given a choice between doing something the safer (but more expensive) way or doing it in a riskier (but less expensive) way, it chose the latter.  As House Energy & Commerce Committee chair Henry Waxman and House Oversight & Investigations Subcommittee chair Bart Stupak wrote to Hayward:

> In spite of the well's difficulties, BP appears to have made multiple decisions for economic reasons that increased the danger of a catastrophic well failure. In several instances, these decisions appear to violate industry guidelines and were made despite warnings from BP's own personnel and its contractors. In effect, ***it appears that BP repeatedly chose risky procedures in order to reduce costs and save time*** and made minimal efforts to contain the added risk.

Letter from H. Waxman & B. Bart Stupak to A. Hayward (June 14, 2010) (unless otherwise noted, all emphases are added).

17.     The Presidential Commission similarly found that, "[G]iven the dangers of deepwater drilling, companies involved must have in place strict policies requiring rigorous analysis and proof that less-costly alternatives are in fact equally safe.  If BP had any such policies in place, it does not appear that its Macondo team adhered to them."

18.     BP's misrepresentations continued after the *Deepwater Horizon* explosion.  After it became apparent that the well was leaking oil into the Gulf of Mexico, BP deliberately downplayed the severity of the ecological disaster it had caused.  In press conferences and television appearances on April 28 and 29, 2010, Defendant Suttles stated that BP's best estimate of the rate of the leak was 1,000 barrels per day ("bopd").  In truth, however, as BP has acknowledged in pleading guilty to federal criminal claims, on or about April 21, 2010, a BP vice president whose knowledge and actions are attributable to BP was aware that the amount of oil being discharged from the well could be as much as 100,000 bopd.  Furthermore, an internal BP document dated April 27, 2010, the day before Suttles' statements, showed that the company's **lowest** estimate of the spill volume was 1,063 bopd, its midpoint estimate was 5,758 bopd, and its high estimate was 14,266 bopd.  Defendants later revised their public estimate of the spill rate to 5,000 bopd, but even this was not defensible in the face of numerous additional estimates that they had but did not disclose, which showed that the spill rate likely was much higher.  Instead, they stuck to the 5,000 bopd estimate only because it was the estimate most favorable to BP.  The amount of oil being spilled was particularly relevant to investors because it was a major determinant of BP's ultimate liability, and investors were entitled to rely on BP to be honest and forthcoming on this point.

19.     On May 19, 2010 the government established an interagency Flow Rate Technical Group charged with generating a preliminary flow rate estimate as soon as possible, and a final estimate based on peer-reviewed methods within two months.  On May 27, 2010, the Flow Rate Technical Group published its first estimate, stating, "The only range of flow rates that is consistent with all 3 of the methods considered by the FRTG is 12,000 to 19,000 barrels per day," and that higher flow rates were possible.  In reaction to this news, the price of BP Ordinary Shares sank by approximately 5%, dropping from 520 GBp on May 27 to 494 GBp on May 28, a loss of 26 GBp per Ordinary Share.  On August 4, 2010, the same day it announced the success of the static kill sealing the well, the federal government released a report estimating that the total volume of oil discharged during the spill was roughly 4.9 million barrels (206 million gallons) and that the flow rate estimate ranged from 62,000 bopd on April 22 to 52,700 bopd just before the flow was stopped.  These estimates were more than ten times higher than the estimate that BP had publicly set forth, but were within the ranges of estimates that BP had on hand internally.

20.     BP has since pled guilty to civil and criminal violations for, amongst other things, intentionally misrepresenting its flow rate estimates, paying more than $4.5 billion in fines and penalties.

## II.      JURISDICTION AND VENUE

21.     The Court has jurisdiction over the state law claims asserted in this matter pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(b)(1), because this case arises out of or in connection with operations conducted on the outer Continental Shelf which involve exploration, development, or production of the minerals of the outer Continental Shelf.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the acts and transactions that constitute violations of law

complained of herein, including the dissemination of the materially false and misleading statements set forth herein, occurred in this District, and were perpetrated by the Company that is headquartered in this District.

23.     Finally, by Order dated August 10, 2010, the Judicial Panel on Multidistrict Litigation transferred several related actions to this jurisdiction for coordination and pretrial proceedings.

## III.   PARTIES

### A.   PLAINTIFFS

24.     Plaintiffs Deka Investment GmbH ("DI"), Deka International S.A. Luxemburg ("DIL"), and International Fund Management S.A. ("IFM") are based in Germany.

25.     Plaintiff DI, a subsidiary of DekaBank, is known as a Kapitalanlagegesellschaft ("KAG").  Under the German Investment Code, a KAG invests the assets of a third party in its own name and makes investments in such name for the benefit of a third party.  A KAG's investment power and legal ownership of the funds carries with it the right to bring legal claims, in its own name, to recover losses incurred by any funds set up by the KAG.  As DI makes all investments in its own name, and also pursuant to applicable German law, it has standing to pursue this action for the economic benefit of the funds in which the investments are allocated.

26.     Plaintiff DIL is an investment fund management company established under the laws of Luxemburg and is a 100% subsidiary of DekaBank.  DIL is a Luxemburg fund management company of FCPs, and as such it has exclusive authority to make investment decisions for the FCPs it manages, and to bring suit to recover any losses incurred by those FCPs.  As DIL makes all investments in its own name, and also pursuant to applicable Luxemburg law, DIL has standing to pursue this action for the economic benefit of the funds in which the investments are allocated.

27.     Plaintiff IFM is an investment fund management company established under Luxemburg law and based in Luxemburg. IFM is a subsidiary of DekaBank Deutsche Girozentrale ("DekaBank"), one of the largest German financial institutions and services providers, with assets under management in its subsidiaries of more than €160 billion, and group locations in Germany, Luxemburg and Switzerland.  IFM is a 100% subsidiary of DekaBank and a Luxemburg fund management company of mutual funds known as "fonds commun de placement" or "FCPs."  Under Luxemburg law, a manager of FCPs has exclusive authority to make investment decisions for the FCPs it manages, and to bring suit to recover any losses incurred by those FCPs.  As IFM makes all investments in its own name, and also pursuant to applicable Luxemburg law, IFM has standing to pursue this action for the economic benefit of the FCPs in which the investments are allocated.

28.     Plaintiff DI is also the legal successor by merger to Deka FundMaster Investmentgesellschaft mbH ("DFM"), another subsidiary of DekaBank which was an investment and fund management company established under the laws of Germany.  DFM was a KAG in the form of a "Master KAG," which is a fund management platform for third party institutional assets under German investment company law.

**B.     DEFENDANTS**

29.     Defendant BP p.l.c. is a United Kingdom corporation that is one of the world's leading international oil and gas companies, operating or marketing its products in around 80 countries.  BP's shareholders include both holders of Ordinary Shares and American Depositary Shares ("ADS").  The primary market for BP's Ordinary Shares is the London Stock Exchange.  In the U.S., BP's ADS trade on the New York Stock Exchange.  Each ADS represents six Ordinary Shares.  As of February 19, 2013, approximately 27% of BP's equity was held by ADS holders.  Because BP ADS trade in the U.S., BP is subject to the reporting requirements of the

Exchange Act and regularly files annual reports and other documents with the SEC.  Throughout the relevant period, BP controlled its subsidiaries named as Defendants in this action, BP Exploration & Production Inc. and BP America Inc.

30.     Defendant BP America Inc. ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas, and is a wholly-owned subsidiary of BP.

31.     Defendant BP Exploration & Production Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Houston, Texas, and is a wholly-owned subsidiary of BP.

32.     Defendant Dr. Anthony B. Hayward ("Hayward") joined BP in 1982.  He held a series of roles in exploration and production, becoming a director of exploration and production in 1997.  He was chief executive officer ("CEO") of exploration and production between 2002 and 2007.  He was an executive director of BP from 2003 to November 2010, and group CEO from May 2007 until October 2010.  Hayward was also a member of a number of executive committees relevant to this action.  Beginning in 2006, Hayward headed the Group Operations Risk Committee ("GORC"), an executive committee responsible for reviewing and internally reporting on safety protocols and responding to safety incidents on a company-wide basis.  In addition, Hayward was the executive liason to the Safety and Ethics & Environment Assurance Committee ("SEEAC"), which was responsible for looking at the processes adopted by executive management to identify and mitigate significant non-financial risks and receive assurance that such processes were appropriate in design and effective in implementation.  SEEAC's mandate including ensuring that the Baker Report's recommendations were implemented, that BP's safety protocols were implemented and followed, and obtaining assurances that the management of material non-financial risks was appropriately addressed by the group chief executive.  During

the relevant period, Hayward signed BP SEC filings containing false and misleading statements and personally made false and misleading statements.  As a member of top management, his conduct and public statements regarding BP are attributable to BP at all times relevant to this action.

33.    Defendant Douglas J. Suttles ("Suttles") was chief operating officer of BP Exploration from January 2009 until January 2011.  During the relevant period, Suttles personally made false and misleading statements.  As a member of top management, his conduct and public statements regarding BP are attributable to BP and BP Exploration at all times relevant to this action.

34.    Defendant Byron E. Grote ("Grote") was appointed chief financial officer of BP in 2002.  Prior to that, he had been an executive director of BP, executive vice president of BP Exploration, and chief executive of chemicals.  On April 27, 2010, Defendant Grote personally made one of the false and misleading statements at issue in this action.  As a member of top management, Grote's conduct and public statements regarding BP are attributable to BP and BP Exploration at all times relevant to this action.

35.    Defendant Robert W. Dudley ("Dudley") became group CEO of BP on October 1, 2010.  Prior to that, he had been a BP executive vice president with responsibility for broad oversight of the company's activities in the Americas and Asia.  Between June 2010 and September 2010, Dudley was the president and CEO of BP's Gulf Coast Restoration Organization in the U.S., and was one of the top BP officials coordinating its spill response.  On May 14, 2010, Defendant Dudley personally made one of the false and misleading statements at issue in this action.  As a member of top management, Dudley's conduct and public statements regarding BP are attributable to BP and BP Exploration at all times relevant to this action.

36.     Defendant H. Lamar McKay ("McKay") was appointed chairman and president of BP America in February 2009.  Before this promotion, he had been executive vice president and chief operating officer of BP America.  In early 2008, he was named executive vice president of BP special projects.  On May 19, 2010, Defendant McKay personally made one of the false and misleading statements at issue in this action.  As a member of top management, McKay's conduct and public statements regarding BP are attributable to BP and BP Exploration at all times relevant to this action.

## IV.     FACTUAL BACKGROUND

### A.     BACKGROUND ON BP

37.     BP is an integrated oil and gas company whose operations include, *inter alia*, drilling exploration and production, refining, distribution, trading, and retail sale.  BP has facilities in around 80 countries, and  BP Exploration has active drilling and production operations in dozens of countries.

38.     At the time of the *Deepwater Horizon* disaster, BP's operations in the Gulf of Mexico had long been at the core of BP America's business.  BP told its investors that the Gulf of Mexico accounted for one sixth of ***all*** oil production in the United States.  Moreover, BP emphasized that it enjoyed relatively high margins on its Gulf of Mexico operations, making them a profit center for the company.

39.     BP's deepwater Gulf of Mexico operations were critically important to the company's profitability and, in turn, its value.  In its communications with investors, therefore, BP emphasized not only the productivity of its deepwater operations in the Gulf of Mexico, but their safety as well.

12

**B.     BP EXPERIENCES A SERIES OF HIGH-PROFILE SAFETY
         INCIDENTS, INCLUDING A DEADLY EXPLOSION AT ITS TEXAS
         CITY REFINERY**

40.     BP had a troubling history of serious safety incidents beginning long before the
*Deepwater Horizon* tragedy.  This history gives critical context to BP's public proclamations
about its proposed commitment to safety reform.

41.     In the span of two weeks in May and June 2000, a BP refinery in Scotland
experienced three major safety incidents.  First, a power failure resulted in the emergency
shutdown of the entire refinery.  Then a large steam pipe ruptured.  Finally, a fire broke out in
the area where oil was processed into gasoline.  An official investigation concluded that all three
incidents were the direct result of "weaknesses in the safety management systems on-site over a
period of time."  BP pled guilty to criminal charges and paid more than £1 million in fines.

42.     In August 2002, the BP drilling rig *Ocean King* suffered a serious explosion and
fire in the Gulf of Mexico.  The drill encountered a large gas pocket, and a cloud of gas
enveloped the rig.  The crew was unable to contain the leak.  A quick decision to evacuate the rig
likely saved many lives because shortly thereafter the airborne gas exploded and caused millions
of dollars in damage to the rig.

43.     A subsequent investigation by the U.S. Department of the Interior's Minerals
Management Service ("MMS") determined that the August 2002 explosion and fire on the
*Ocean King* was caused and/or exacerbated by an incorrect blowout diverter system.  It is
common to encounter gas pockets during drilling operations, and blowout diverters are designed
to prevent them from causing potentially catastrophic explosions and fires.  BP had not installed
the blowout diverter system specified in the design of the rig, and had not incorporated the
system actually installed into the rig's specifications.  Moreover, BP had stored pressurized gas
tanks near the blowout diverter's output, a self-evidently dangerous practice.

44.     After major repairs, the *Ocean King* resumed drilling operations in the Gulf of Mexico.  In November 2002, the *Ocean King* narrowly avoided a repeat of the August 2002 explosion and fire.  The crew was attempting to temporarily seal a freshly drilled well hole with cement, so the drilling rig could be removed and the production rig could be installed.  This "cementing job" is a common procedure.  In this case, however, a massive gas leak from the freshly drilled well hole enveloped the rig in flammable gas, forcing the crew to evacuate the rig.

45.     The MMS investigation was deeply critical of BP's process safety practices.  The MMS cited as causes of these back-to-back gas blowouts BP's inadequate safety process planning, inadequate training of personnel, failure to construct the *Ocean King* as designed, and failure to maintain accurate records of the *Ocean King*'s actual construction specification.

46.     In the wake of these incidents, the MMS also issued a Safety Alert to all oil and gas companies operating in the Gulf of Mexico, alerting them to the dangers of a catastrophic gas blowout if a cementing job was not performed correctly.  The Safety Alert also contained some of its investigatory findings concerning BP's "erroneous chain of decisions, inadequate training of personnel or knowledge of the diverter system, and inadequate planning."

47.     Despite this stinging and public rebuke of BP's process safety on its Gulf of Mexico drilling rigs, only six months later another BP drilling rig in the Gulf of Mexico narrowly averted a third blowout.  In May 2003, the riser pipe connecting the *Discoverer Enterprise* to the sea floor broke when the rig shifted its position.  Disaster was averted only because the backup deadman switch on the rig's blowout preventer functioned correctly, sealing the system below the break in the riser and thereby preventing a massive discharge of oil and gas into the Gulf.

48.     An inspection later revealed that pieces of the *Discoverer Enterprise*'s destroyed riser pipe had damaged, but fortunately had not disabled, the blowout preventer.  The broken pieces of the riser pipe came to rest leaning against the blowout preventer, near its control lines.  In a prelude to the *Deepwater Horizon* disaster, BP had a real-life warning that a broken riser pipe could potentially damage or disable a blowout preventer.

49.     The following year, BP received yet another object lesson in the hazards of offshore drilling.  In August 2004, the drilling rig *GSF Adriatic IV* exploded off the coast of Egypt while drilling a gas well for a consortium of gas companies that included BP and others.  A faulty cementing job resulted in a gas blowout, a massive explosion, and a week-long fire.

50.     The next year, BP's luck ran out.  After a rapid succession of close calls and near-misses, catastrophe struck.  On March 3, 2005, a massive explosion at BP's Texas City, TX refinery killed fifteen people and injured 180 more.  Numerous criminal investigations of BP followed in the wake of this disaster.  Investigators ultimately determined that BP had ignored its own protocols on operating a refinery tower and that a warning system had been disabled.  BP pled guilty to federal felony charges and paid more than $50 million in fines to the U.S. Environmental Protection Agency.

51.     Just a few months after the Texas City disaster, BP had another close call in the Gulf of Mexico.  In July 2005, the *Thunder Horse PDQ*, BP's new, state-of-the-art drilling and production rig was temporarily evacuated because of a hurricane.  During this evacuation, the *Thunder Horse PDQ* nearly capsized because a valve had been installed backwards and allowed water to fill one portion of the rig, dangerously destabilizing it.  Although the rig did not capsize and sink, the enormous pressure caused extensive damage, including cracks in the rig's riser

15

pipes, that kept the *Thunder Horse PDQ* in dry dock for three years.  If the riser pipes had ruptured, instead of cracking, the oil spill could have been huge and difficult to contain.

52.     In October 2005, at the Chemical Safety Board's urging, BP appointed an independent group, chaired by former Secretary of State James Baker, to investigate the specific causes of the Texas City disaster and, more broadly, BP's approach to industrial safety.

53.     Before the Baker group could complete its work, another industrial fiasco beset BP.  On March 2, 2006, BP discovered that its pipeline to Prudhoe Bay, on the northern shore of Alaska, had been leaking for weeks.  Subsequent civil and criminal investigations concluded that the leak – and another leak that developed on another portion of the same pipeline in August 2006 – were caused by widespread corrosion in many areas of the pipeline due to BP's failure to inspect and maintain the pipeline.  The investigation estimated that the spill amounted to between 210,000 and 260,000 gallons of oil.  The investigation also concluded that the duration of the spill before its discovery in March 2006 was further evidence of BP's criminal negligence.  In 2007, BP pled guilty to criminal negligence concerning the March 2006 pipeline spill.  BP was sentenced to three years' probation, fined, $22 million, and admitted that its process safety was so abysmal that it constituted criminal negligence.

### C.     BP ASSUAGES INVESTOR CONCERNS BY PLEDGING TO INSTITUTE THE BAKER GROUP'S SAFETY REFORMS ACROSS THE COMPANY'S OPERATIONS

54.     In January 2007, the Baker group issued its report.  The Baker Report found "a lack of operating discipline, toleration of serious deviations from safe operating practices, and apparent complacency toward serious process safety risks."  These practices and attitudes were evident "from the top of the company, starting with the Board and going down" and the Baker Report, unsurprisingly, determined that "BP has not provided effective process safety leadership

and has not adequately established process safety as a core value."  It concluded with a list of ten

actions for BP to immediately implement:

Recommendation 1 – Process Safety Leadership – The Board of Directors of BP p.l.c., BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals for process safety.  Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.

Recommendation 2 – Integrated and Comprehensive Safety Management System – BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.

Recommendation 3 – Process Safety Knowledge and Expertise – BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.

Recommendation 4 – Process Safety Culture – BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

Recommendation 5 – Clearly Defined Expectations and Accountability for Process Safety – BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and the refining management and supervisory reporting line.

Recommendation 6 – Support for Line Management – BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

Recommendation 7 – Leading and Lagging Performance Indicators for Process Safety – BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors.  In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other government agencies, and other organizations to develop a consensus set of leading and lagging indicators for process safety performance for use in the refining and chemical processing industries.

Recommendation 8 – Process Safety Auditing – BP should establish and implement an effective system to audit process safety performance at its U.S. refineries.

Recommendation 9 – Board Monitoring – BP's Board should monitor the implementation of the recommendations of the Panel (including the related commentary) and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations. The Board should also report publicly on the process of such implementation and on BP's ongoing process safety performance.

Recommendation 10 – Industry Leader – BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management. The Panel believes that these recommendations can help bring about sustainable improvements in process safety performance in all BP U.S. refineries.

55.     BP immediately pledged to follow the Baker Report's recommendations. The same day the Baker Report was released, BP's then-CEO John Browne held a press conference where he stated:

If I had to say one thing which I hope you will all hear today, it is this: "BP gets it." And I get it too. This happened on my watch and, as Chief Executive, I have a responsibility to learn from what has occurred. I recognize the need for improvement and that my successor, Tony Hayward, and I need to take a lead in putting that right by championing process safety as a foundation of BP's operations.

56.     At the same press conference, Browne stated: "BP's work force is ready, willing and able to participate in a sustained Group-wide effort to move BP towards excellence in process safety. BP's safety lapses have been chronic."

57.     The Baker Report was just the first of many investigations that condemned BP's deplorable safety record in the strongest terms. The Chemical Safety Board, which had also investigated the Texas City disaster, issued its report in March 2007, two months after the Baker Report. It concluded that BP's management provided "ineffective leadership and oversight." It

faulted BP for remaining complacent despite the many recent warning signs (some of which are described above) that its process safety approach was not working.  It also tied BP's process safety failures to specific policy choices, including staff and budget cuts in process safety.  The Chemical Safety Board report noted that BP "did not implement adequate safety oversight, provide needed human and economic resources, or consistently model adherence to safety rules and procedures."

58.     Similar to its commissioning of the Baker panel for the Texas City disaster, in March 2007, BP retained the Booz Allen Hamilton consulting firm to review the Prudhoe Bay pipeline spill.  Booz Allen concluded that senior management and the Board had created and modeled a culture in which cost-cutting – and not process safety – was the dominant value.  In particular, Booz Allen noted that BP had not created and implemented a system for communicating process safety risks within the organization:   "Risk-related vertical and horizontal communications do not elevate critical risk data to senior leadership."

59.     In congressional hearings on industrial safety, Chemical Safety Board Chair Carolyn Merritt pointed out that the Booz Allen report on Prudhoe Bay and the Chemical Safety Board report on Texas City reached virtually identical conclusions in many areas.  Ms. Merritt noted that "virtually all of the seven root causes identified for the Prudhoe Bay incidents have strong echoes in Texas City."   In both instances, the catastrophe could be traced to "flawed communication of lessons learned, excessive decentralization of safety functions and high management turnover.  BP focused on personal safety statistics but allowed catastrophic process safety risks to grow."

60.     BP and the company's investors were on plain notice that BP's safety issues were not confined to its refining operations, or its pipeline operations, or its deepwater drilling

operations.  Its safety issues were company-wide.  BP pledged to address them, and to do so quickly, aggressively, and comprehensively.  This was a big promise.  Backing it up would require a significant commitment of resources, far beyond the direct cost of upgrading infrastructure and writing new policy manuals.  It would also require BP's managers to jettison comfortable habits learned over the course of their careers.  Further, it would require BP to delay or even abandon profitable activities if they could not be made to conform to process safety best practices.  BP repeated this promise time and again.  And BP's failure to deliver on this promise led to the largest industrial disaster in United States history.

61.    In a 2007 conference call with analysts, Browne reiterated BP's promise to implement the Baker Report's recommendations and to make safety a central, company-wide focus.  He stated,  "Safety is fundamental to everything that we will do.  We will embrace with equal commitment each of the three dimensions of safety – personal safety, process safety, and the environment.  Our aspiration is to be an industry leader in each."

62.    When Defendant Hayward succeeded Browne as BP's CEO in May 2007, he underscored the same point, stating that he would "focus on safety like a laser."

63.    BP created the OMS to implement the Baker Report's suggestions company-wide.  In BP's 2006 Sustainability Report, published in May 2007, OMS was described as "a comprehensive system that covers all aspects of our operations."  The report underscored that "OMS will apply to all operations."  Although the Baker Report addressed its process safety recommendations specifically to U.S. refinery operations, BP told its investors that it would apply those recommendations to *all* of its operations.

### D. TOP BP MANAGEMENT KNEW THAT IN CONTRAST TO THEIR PUBLIC REPRESENTATIONS, OMS DID NOT APPLY TO ALL BP OPERATIONS IN A UNIFORM MANNER

64. To implement the OMS, BP established GORC. GORC's mandate was to elevate safety concerns from across the company so they could be identified by the heads of all BP's units, and managed by common and agreed-upon protocols. As Andrew Inglis, the CEO of BP Exploration described it, "[GORC] was set up by – by Tony Hayward to monitor our safety and integrity performance. It was there to act as a vehicle for continuing to improve our performance. That was through OMS. So part of it was to actually look at how OMS was being implemented. It connected into the OMS audit function, so that reported in to GORC. Also, members of GORC were the key technical leads in integrity management." Deposition of Andrew Inglis at 279-80, *In re Oil Spill by the Oil Rig "Deepwater Horizon"*, MDL No. 2179 (E.D. La.) ("Inglis Dep.")

65. Defendant Hayward confirmed that his roles as GORC Chair provided him with comprehensive, timely information concerning process safety at BP and, in particular, the implementation of OMS. He testified:

> Q: And you are very familiar with process safety because of your position as Chair of the Group Operating Risk Committee, aren't you?
>
> A: I am.
>
> *****
>
> Q: And one of the responsibilities you had [was] "Oversight of development and implementation of BP's Operating Management System . . ."
>
> A: That's correct.

Deposition of Anthony Hayward at 149, 163, *In re Oil Spill by the Oil Rig "Deepwater Horizon"*, MDL No. 2179 (E.D. La.) ("Hayward Dep.")

21

66.     In his role as GORC Chair, Hayward regularly attended and participated in the meetings of SEEAC, which was responsible for assuring that BP published accurate information concerning safety, ethical, and environmental matters.   In its 2008 Annual Report, BP stated that SEEAC was responsible for "[r]eviewing material to be placed before shareholders that addresses environmental, safety and ethical performance and mak[ing] recommendations to the Board about their adoption and publication."

67.     Hayward's role was to report to SEEAC any significant developments relevant to GORC, especially BP's implementation of OMS.   William Castell, Chair of SEEAC, testified that members of SEEAC and GORC received a quarterly "Orange Book," which was "a compilation of Operations and Risk data" concerning "the level of safety achieved, the lead and lag factors, the major incidents reported."   Deposition of William Castell at 377, *In re Oil Spill by the Oil Rig "Deepwater Horizon"*, MDL No. 2179 (E.D. La.).   The chief financial officer of BP Exploration has testified that the Orange Book was intended to ensure that safety metrics "had the same level of standing in the firm as financial information."   Deposition of Ellis Armstrong at 85, *In re Oil Spill by the Oil Rig "Deepwater Horizon"*, MDL No. 2179 (E.D. La.). The Orange Book helped keep members of GORC up to date regarding the state of OMS implementation.   As Inglis testified:

> [The Orange Book] was sort of under my leadership, and then it got introduced as something that would apply across the whole of the – of the group, but, in essence, it was to provide a – a performance monitoring in – performance monitoring around safety and operational integrity.   So it had in it key performance indicators, indicators of progress on various initiatives, whether they be the six-point plan, the implementation of OMS. So it was a – a compendium of all of the information that you could use to assess progress on our safety and operation integrity agenda.

Inglis Dep. at 287.

68.     Hayward has testified that the Orange Book was a key document for keeping management informed about the state of OMS across BP's operations.

> Q: And what other areas would not have had OMS fully implemented until the end of 2010, other than the Gulf of Mexico?
>
> A: I can't remember the list, but, you know, we have a list that's in many of these reports, that – that document – if you refer to the thing called the Orange book, it's very clear which areas are complete, which areas are in – in transition.

Hayward Dep. at 791.

69.     In addition, on information and belief, in February 2009, Hayward received a report from Inglis confirming that the Gulf of Mexico had not completed the transition to OMS by year-end 2008.

70.     As discussed at greater length in §§V.A-L, *infra,* Defendants made numerous representations to the public regarding their supposed commitment to implement the Baker Panel's recommendations and their progress in implementing process safety reforms across the company's worldwide operations.  For example, in BP's 2009 Form 20-F Annual Report filed with the SEC, which was signed by Hayward, BP represented that:

> Safe, reliable and compliant operations remain the group's first priority.  A key enabler for this is the BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency.
>
> *****
>
> This performance follows several years of intense focus on training and procedures across BP.  BP's operating management system (OMS), which provides a single operating framework for all BP operations, is a key part of continuing to drive a rigorous approach to safe operations.  2009 marked an important year in the continuing implementation of OMS.
>
> *****
>
> Our OMS covers all areas from process safety, to personal health, to environmental performance.

23

*****

> Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics and Environment Assurance] committee has observed a number of key developments, including: the establishment of a safety & operations (S&O) function with the highest caliber of staff; development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites; the establishment of training programmes in conjunction with MIT that are teaching project management and operational excellence; the dissemination of standard engineering practices throughout the group; and the formation of a highly experienced S&O audit team formed to assess the safety and efficiency of operations and recommend improvements. Throughout this time the group chief executive has made safety the number one priority.

71.     Specifically with regard to the Gulf of Mexico, BP's SEC filings stated that its Gulf of Mexico operations had "completed the transition to OMS in 2008." Form 20-F 2008 Annual Report; Form 20-F 2009 Annual Report.

72.     These assurances that fundamental process safety reforms, embodied by the Baker Report's recommendations and the OMS, were being comprehensively implemented across all of BP's operations, were false. Rather, Defendants had made a conscious business decision to exempt many of BP's operations – including almost all of BP's deepwater drilling activities in the Gulf of Mexico – from the process safety aspects of OMS, even though it had liability for safety issues that occurred in these "exempted" operations.

73.     Numerous BP executives, including Hayward, have admitted in sworn testimony that OMS's process safety mechanisms were never intended to apply to any oil rig unless it was wholly owned by BP.

a)      Defendant Hayward has testified that unless a rig is wholly-owned by BP, "There's no one from BP involved in implementing well control procedures. . . . BP doesn't have well control procedures to manage a well that is beginning to flow, because we're not actually drilling any of the wells that our contractors are." Hayward Dep. at 668.

24

b)   John Mogford, BP's former Global Head of Safety & Operations, and a GORC member, has testified that "[F]rom the start, OMS was designed for BP owned and operated and controlled sites."  Deposition of John Mogford at 460, *In re Oil Spill by the Oil Rig "Deepwater Horizon"*, MDL No. 2179 (E.D. La.).  Moreover, Mogford testified that GORC members knew of this limitation because the "OMS document, it was approved, and the scope was approved . . . at the GORC" and the GORC held "a discussion that the scope was that [OMS] applied to BP owned and operated and controlled sites."  *Id.* at 461.

c)   Pat O'Bryan, BP's Vice President of Drilling & Completions has testified that the ***only*** drilling rig in the Gulf of Mexico on which OMS was to be implemented was the wholly-owned *Thunder Horse PDQ* – although at the time OMS was created in 2007, it would not have been applied even to the *Thunder Horse PDQ* because that rig was still in dry dock, being repaired after the 2005 mishap in which it nearly capsized and sank.  Deposition of Patrick O'Bryan at 413, *In re Oil Spill by the Oil Rig "Deepwater Horizon"*, MDL No. 2179 (E.D. La.).

d)   John Baxter, BP's Group Head of Engineering, and a GORC member, has testified that OMS did not apply to the *Deepwater Horizon*, that there was no requirement that a major accident risk analysis be done on the *Deepwater Horizon,* and that BP did not implement its integrity management system on the *Deepwater Horizon*.  He testified that  BP "does not apply its safety management system to other activities where the contractor has their own safety management system and so there – there – there is no requirement to actually – to bring the BP safety management – the OMS to actually apply that to the contractors'

activities."  Deposition of John Baxter at 175, 192, *In re Oil Spill by the Oil Rig "Deepwater Horizon"*, MDL No. 2179 (E.D. La.).

e)  John Guide, BP's Wells Team Leader for the *Deepwater Horizon*, has testified that he received no OMS training until January 2011.  Deposition of John Guide at 433, *In re Oil Spill by the Oil Rig "Deepwater Horizon"*, MDL No. 2179 (E.D. La.).

74.  Furthermore, Hayward has testified that he had direct and specific knowledge that OMS was not fully implemented in the Gulf of Mexico at the time of the *Deepwater Horizon* disaster:

Q: Did you know in April of 2010, that the OMS had not been fully implemented in the Gulf of Mexico?

A: I – Yeah.  I believe I was aware it had not been fully implemented.  It was in the process of being implemented as it was in other parts of BP.

Q: But specifically with respect to the Gulf of Mexico, that's your answer?

A: Yes.

Q: Okay.  When did you come to learn that?

A: I would have been aware of it prior to the – you know, in the course of doing my – my job.

Q: Okay.

A: Because we had a – as I've explained a number of times through this deposition, the Group Operations Risk Committee was looking at the progress of implementation.

Q: So you were getting reports as to where it was implemented, where it was not yet implemented?

A: And where it – where it was entrained, so to speak.

Hayward Dep. at 662-63.

75.     Hayward also testified that the process of implementing OMS in the Gulf of Mexico only began in fall 2009, and was not anticipated to be complete until the end of 2010:

> Q: [Y]ou said that you were on target to implement OMS in the Gulf of Mexico in 2009?
>
> A: I – my recollection is that we began the process of cutover to OMS in the Fall of 2009.
>
> *****
>
> Q: And you recollection also is that you would have completed that implementation in the Gulf of Mexico by the end of 2010?
>
> A: That's correct.

Hayward Dep. at 789.

76.     Counsel for BP has summarized the situation as follows:

> BP: What happened here is that BP, as the owner of the well, contracted with a third party, Transocean, to drill it.  It's as if I owned the land and I hire a contractor to build a house on it.  Now, I own the land and I can tell the contractor what kind of house to build on it, but the idea that I can dictate to my contractor the safety processes or procedures for its workers, you can't do that.  *I honestly think that when BP was implementing OMS for its company, no one ever thought that BP was going to be able to superimpose [OMS] on third party contractors that it hires–*
>
> The Court: I don't think that's the argument.  I think the argument is that if they were not going to do that, they should have made it very clear that they were not going to do that.

Nov. 4, 2011 Oral Argument Tr. 80:7-20 [4:10-md-2185; Dkt. 305].

77.     According to a report prepared by a former BP consultant named Dr. Robert Bea (the "Bea Report"), BP used assessments called Major Accident Risk ("MAR") analyses to evaluate significant process safety risks and bring them to the attention of senior management. BP did not, however, require contractor-owned offshore drilling units to be incorporated into MAR reviews.  No matter how high the risks of such operations, they would be managed by local organizations and the contractor.  BP, however, retained authority to decide matters such as

27

well design, how aggressively wells would be drilled, and how to complete and abandon wells, thereby producing conflicts in authority, responsibility and management.

78.     Another important component of OMS was a Safety & Operations Integrity audit process that BP management used to monitor process safety performance.  Safety & Operations Integrity audits were used to, amongst other things, test rig and rig personnel compliance with safety and risk management standards.   Contractor-owned rigs, however, were consciously excluded from the scope of the Safety & Operations Integrity audit function.

79.     Contractor-owned rigs were not entirely exempted from OMS or overlooked in the OMS architecture, but they were treated quite differently from BP-owned assets, in that assets and entities not fully owned or operated by BP would be subject to the safety systems of the owning or operating party.   While those safety systems would be compared to OMS standards, and it was contemplated that there would be some "gap assessment" or "bridging" process in order to render them comparable to OMS, OMS did not itself govern their systems. Thus, rather than the uniform process safety system that Defendants repeatedly touted to investors, they actually imposed a patchwork of different standards depending on the standards of the contractors that BP worked with at any particular site.

80.     Moreover, on information and belief, to the extent that BP did attempt to "bridge" deficient contractor safety programs to bring them up to OMS equivalence, it did so with respect to personal safety programs, and not process safety.  Process safety, however, was the focus of Baker Report, the predominant weakness in BP's safety culture that OMS was intended to address, and the predominant aspect of safety that was on investors' minds after the Texas City explosion.

81.     According to the Bea Report, between October 2004 and April 2010, BP drilled approximately 176 deepwater exploration wells in the Gulf of Mexico, 69% of which were drilled by contractor-owned drilling rigs.  At the time of the *Deepwater Horizon* disaster in April 2010, six of the seven rigs performing drilling operations for BP – including the *Deepwater Horizon* itself – were not wholly-owned by BP.  As such, BP's representations that it was applying OMS across **all** of its operations, and that its Gulf of Mexico operations had completed that transition in 2008, were false and misleading.  The reality of the situation was that OMS was being applied selectively, in a manner that did not cover all BP operations and only a small minority of its Gulf of Mexico operations.  Indeed, the BP manual that the *Deepwater Horizon* onshore well team was using to manage risk prior to the Macondo disaster predated the Texas City disaster.  That manual defined risks strictly in an economic sense, namely the effects that a risk could have on the "delivery" and "net present value," of a well, and did not include explicit evaluations of health, safety and environmental impacts.

82.     Hayward admitted that the *Deepwater Horizon* tragedy could potentially have been averted if the reality of OMS implementation in the Gulf of Mexico had matched BP's representations in its public filings:

> Q: If OMS had been implemented in the Gulf of Mexico before April 20, 2010, is there not the potential for having avoided this terrible catastrophe?
>
> ******
>
> A: There is possible potential – undoubtedly.

Hayward Dep. at 793-94.

### E.    BP MANAGEMENT WAS AWARE OF THE CHRONIC SHORTCOMINGS IN BP'S PROCESS SAFETY SYSTEMS

83.    BP's failure to consistently implement OMS across all of its operations was just one aspect of a much broader failure to implement effective process safety reforms or otherwise apply the lessons of the Baker Report.  BP continued to emphasize personal safety over process safety and continued to commit the same sorts of mistakes that had led to the Texas Safety blast. The Presidential Commission found that:

> [D]espite the improvement in injury and spill rates [from 1999 to 2009], BP has caused a number of disastrous or potentially disastrous workplace incidents that suggest its approach to managing safety has been on individual worker occupational safety but not on process safety.  These incidents and subsequent analyses indicate that the company does not have consistent and reliable risk-management processes – and thus has been unable to meet its professed commitment to safety.  BP's safety lapses have been chronic.

84.    BP management either knew of these "chronic" safety lapses or, at a minimum, were reckless for not so knowing.  During the same time period that BP was making rosy statements to investors about its commitment to process safety (*see* §IV.C), BP and its senior management were also receiving indications from an array of sources – including internal reports and warnings and penalties from regulators – that BP's process safety mechanisms were lagging far behind its public representations.  As FORTUNE magazine reported in a January 24, 2011 article entitled, *BP: 'An Accident Waiting To Happen*,' an internal BP strategy document dated December 2008 stated:

> It's become apparent that process-safety major hazards and risks are not fully understood by engineering or line operating personnel.  Insufficient awareness is leading to missed signals that precede incidents and response after incidents, both of which increases the potential for and severity of process-safety related incidents.

85.    During the relevant period, BP experienced a number of accidents and close calls that alerted management (through the Orange Book and other reporting mechanisms) that their

safety shortcomings had not been fixed.  For example, in September 2008, a rig operating in Azerbaijan suffered a blowout forcing the rig to be evacuated.  According to diplomatic cables quoted by a December 17, 2010 WALL STREET JOURNAL article, *Cables Suggest BP Near-Fiasco in '08*, the leak forced BP to evacuate 211 workers from the site of the leak and partially shut down production of the field, causing a temporary production reduction of about 600,000 barrels a day.  The cables quoted the then-head of BP Azerbaijan as saying that the emergency evacuation was "the largest . . . in BP's history."

86.    BP received repeated warnings from regulators that its safety practices were insufficient.  Between 2006 and 2010, the United Kingdom Health and Safety Executive ("HSE") sent BP dozens of letters or notices citing safety or environmental violations (many related to BP's deepwater drilling operations near Scotland).  On February 2, 2007, the HSE sent BP a letter with regards to a problematic rig named the *Schiehallion*, noting that BP's decisions with respect to that rig "have not in any way been informed by a systematic assessment [by independent safety inspectors] to achieve compliance with those RSPs . . . that are intended to avoid the failings that might align to cause major accidents."

87.    U.S. state and federal regulators also repeatedly pressed BP on its safety failings.  According to a May 8, 2010 article published in the NEW YORK TIMES, *For BP, a History of Spills and Safety Lapses*, in 2007, when Hayward took over as chief executive, BP settled a series of criminal charges related to its safety lapses (including some related to Texas City) and agreed to pay $370 million in fines.  BP admitted that, "[o]ur operations failed to meet our own standards and the requirements of the law," and pledged to improve its risk management.  Yet the pledged improvements were not forthcoming.  For example, in 2009, OSHA found more than 700 violations at the Texas City facility and fined BP a record $87.4 million, four times the

previous record fine (which had been for the 2005 Texas City explosion).  Another BP refinery in Toledo, Ohio was fined $3 million in 2010 for "willful" safety violations, including the use of valves similar to those that had contributed to the Texas City explosion.

88.     Finally, and perhaps most significantly, BP chose to prioritize cost-cutting at the expense of safety.  According to the May 8, 2010 NEW YORK TIMES article, investigators found that routine maintenance that might have averted the 2005 Texas City blast had been delayed because of pressure to reduce expenses.  Furthermore, according to the Bea Report, in late 2009 BP Exploration began cutting costs by removing members of the Gulf of Mexico safety leadership without consideration of how that would ultimately affect process safety and risk management, leaving the team with no single member that was ultimately responsible for those functions.  Rather, responsibility was ineffectively spread throughout the group.

89.     BP pledged to change its woeful process safety track record, and was then faced with a choice.  It could commit money and personnel and undertake the painful process of unlearning dysfunctional approaches to process safety.  Or it falsely claim to be doing these things, and gamble that the disaster it courted would never come to pass.

### F.   BP RETALIATED AGAINST WHISTLEBLOWERS WHO RAISED SAFETY CONCERNS

90.     In addition to not applying OMS nearly as comprehensively as it had represented, BP made a mockery of its supposed commitment to safety by retaliating against employees who brought safety problems and concerns to the company's attention.  As noted above, numerous investigations found that a central failing of BP's process safety practices was the lack of prompt and full information sharing.  One of the Baker Report's key recommendations was to improve safety reporting practices within BP:  "BP should involve the relevant stakeholders to develop a

positive, trusting, and open process safety culture[.]"  BP expressed fealty to this concept in its

public statements, but betrayed it by retaliating against employees who raised safety concerns.

91.     Robert Malone, Chairman and President of BP America, and Executive Vice

President of BP, testified before the U.S. House of Representatives on May 16, 2007, shortly

after the sharply critical reports from the Baker panel, Booz Allen, and the Chemical Safety

Board.  He stated:

> I continue to meet with employees to reinforce my expectations of them:  that
> they must ensure our operations are safe, that they understand they have both a
> right and responsibility to shut down any process they feel is unsafe or
> operationally unsound, and that they are encouraged to raise concerns on any
> issue.
>
> *****
>
> BP does not tolerate retaliation against workers who raise safety concerns.

92.     Similarly, on December 17, 2008, Hayward gave a public speech, and BP posted

the transcript to its public web site.  Hayward stated that Texas City, Prudhoe Bay, and the many

other incidents described above "exposed shortcomings – but they also gave us a huge

opportunity to learn and improve the way we operate.  We opened ourselves up to scrutiny – and

we listened more to our front-line operations people – who, of course, really know what is going

on the ground."

93.      Yet despite these and similar statements, BP not only failed to listen to its

frontline operations personnel, it retaliated against them when they raised important concerns.

For example, according to a June 7, 2010 PROPUBLICA article, *Years of Internal BP Probes*

*Warned That Neglect Could Lead To Accidents,* Kenneth Abbott accepted a job with a BP

contractor as a project control leader on the *Atlantis*, a BP drilling rig in the Gulf of Mexico, in

August 2008.  He believed that BP's practices for maintaining designs and blueprints of the

*Atlantis*'s critical systems were inadequate.  In particular, when the *Atlantis*'s equipment or

systems were changed as a result of repair, maintenance, or replacement, the blueprints and other design documents were not updated to reflect the changes, such that as-built documents were issued for only 274 of more than 7,100 pieces of equipment.  Abbott brought these important concerns to his managers' attention.  BP knew from first-hand experience in the Gulf of Mexico that such a nonchalant approach to recordkeeping could have dire consequences.  As noted above, the official investigation of the November 2002 gas blowout aboard the *Ocean King*, identified precisely such a failure to keep accurate and up-to-date design documentation as the primary culprit in a gas blowout that averted outright catastrophe only because the gas cloud that enveloped the rig did not explode.

94.     Abbott told ProPublica that while he raised these concerns with BP, BP's engineers resisted completing the documentation process.  "I just hit a lot of resistance from the lead engineers. . . . They got really angry with me.  They wanted to shortcut the system and not do the reviews, because they cut short the man hours. . . . There seemed to be a big emphasis to push the contractors to get things done and that was always at the forefront of the operation."  Abbott estimated that by maintaining incomplete documentation at the *Atlantis* rig, BP saved approximately $2-3 million.  Abbott was subsequently terminated from his position.

95.     On April 13, 2010, BP's Deputy Ombudsman Billie Garde wrote to Abbott that his "concerns about the [*Atlantis*] project not following the terms of its own Project Execution Plan were substantiated."  Garde echoed Sawyer's finding that BP "did not do a comprehensive documentation audit regarding the documentation issues on *Atlantis*."  Garde concluded that "[t]he concerns that you expressed about the status of the drawings upgrade project were . . . of concern to others who raised the concern before you worked there, while you were there, and after you left."

96.     Barely two months after Garde wrote to Abbott vindicating his concerns, the type of nightmare scenario that Abbott and Sawyer feared came to pass when the *Deepwater Horizon* exploded.  In the wake of the *Deepwater Horizon* disaster, Abbott testified before the U.S. Congress.  Asked why he raised his process safety concerns with senior BP management, Abbott testified:

> From my experience working in the industry for over 30 years, I have never seen these kinds of problems with other companies.  Of course, everyone and every company will make mistakes occasionally.  I have never seen another company with the kind of widespread disregard of proper engineering and safety procedures that I saw at BP and that we hear from the news reports about BP *Horizon*, or BP Texas City, or the BP Alaska pipeline spills.  BP's own investigation of itself, by former Secretary of State James Baker, reported that BP has a culture which simply does not follow safety regulations.  From what I saw, that culture has not changed.

97.     The retaliation against Abbott for raising safety concerns was not a one-off occurrence.  It was part of the culture at BP.  BP's workers reported a fear of retaliation like that Abbott encountered when he reported safety concerns, and BP management knew about these attitudes among their workers.  At the same time Sawyer and Garde were investigating Abbott's concerns, BP commissioned a survey, conducted in March 2010, of its workers on the *Deepwater Horizon* and three other drilling rigs.  According to the Presidential Commission this survey found that "*[s]ome 46 percent of crew members surveyed felt that some of the workforce feared reprisals for reporting unsafe situations.*"

98.     The same atmosphere of fear pervaded BP's Alaska operations at the same time. In Alaska, the 2006 Prudhoe Bay spills had led to BP's guilty plea to criminal negligence and the sharply critical Booz Allen report in 2007, followed by Hayward's repeated pledge to implement the Baker Report's recommendations company-wide via the OMS.  According to an October 26, 2010 PROPUBLICA article, *Furious Growth and Cost Cuts Led To BP Accidents Past and*

*Present,* as early as 2007 a BP contractor named Marty Anderson raised serious concerns with BP's Ombudsman about the still-unremedied corrosion on BP's Alaska pipeline, and the utter inadequacy of its inspection and maintenance program.  In particular, Anderson noted that there was inadequate record-keeping by BP and Acuren, the company BP hired to conduct pipeline inspections.  Anderson also noted that the inspectors Acruen hired were not qualified to perform the pipeline inspections for which they were responsible.  Conducting the inspections properly would have cost BP money, so it didn't happen.

99.     The Ombudsman investigated Anderson's concerns and confirmed they were correct, stating:  "The concerns were serious, and although people try to downplay the significance of the issues, they reveal a complete breakdown."  The Ombudsman also noted, in a letter to BP's general counsel, that "Marty became the subject of both overt and subtle retaliation by Acuren and [BP] personnel."

100.     PROPUBLICA also reported that in December 2009, Stuart Sneed, a BP pipeline worker, suffered retaliation when he reported manipulation of safety testing results.  In a report that was delivered to BP executives in late 2006, BP's investigators substantiated Sneed's concerns and confirmed his account of what happened when he reported problems.  "Many of the people interviewed indicate that they felt pressured for production ahead of safety and quality," the report stated.  Sneed said,  "They say it's your duty to come forward . . . but when you do come forward they screw you.  They'll destroy your life.  No one up here is going to say anything if there is something they see is unsafe.  They are not going to say a word."

G.     **THE *DEEPWATER HORIZON* DISASTER REVEALS THE INCOMPLETE SCOPE AND INADEQUATE APPLICATION OF BP'S SAFETY REFORMS**

101.     In March 2008, BP acquired exclusive drilling rights for Mississippi Canyon Block 252, a nine square mile pilot in the Gulf of Mexico encompassing the Macondo well

(which was BP's first well on the new lease). The Macondo well was located 40 miles off the coast of Louisiana, and was thought to hold as much as about fifty million barrels of producible oil.

102.     In October 2009, the Transocean rig *Marianas* began drilling the Macondo well. When the *Marianas* was damaged by Hurricane Ida, the *Deepwater Horizon* was brought in to replace it. The *Deepwater Horizon* arrived at the site on January 31, 2010, and commenced drilling around February 10, 2010.

103.     At the time the *Deepwater Horizon* began drilling, BP already knew of significant problems with the rig. In late 2009, BP conducted a rig safety audit and discovered 390 outstanding maintenance issues requiring an estimated 3,545 man-hours to remedy. Moreover, the Macondo drilling job was particularly challenging, leading some of the *Deepwater Horizon*'s crew members to nickname Macondo the "well from hell." By the time of the explosion on April 2010, BP was already almost six weeks behind schedule and more than $58 million over budget. A *Deepwater Horizon* crew member told 60 MINUTES that BP had pressured workers to speed up the rate of penetration rather than risk further project delays that would cost BP millions more.

104.     The *Deepwater Horizon*'s first task at the site was to lower its enormous blowout preventer ("BOP") onto the wellhead. The BOP is a 400-ton stack of valves that doubles as a drilling tool and emergency safety device. Once it is in place, everything needed in the well passes through the BOP. The *Deepwater Horizon* BOP had several features that were intended to be used to seal the well, including donut-shaped rubber elements called "annular preventers" that were supposed to seal off the annular space around the drill pipe when they were squeezed shut and five sets of metal rams.

105.    On April 9, 2010, heavy drilling mud that the *Deepwater Horizon* was pumping into the Macondo well fractured the surrounding rock formation, causing the drilling mud to begin flowing into the cracks.  To plug the fractures, BP circulated 172 barrels of a thick fluid known as a "lost circulation pill."  This approach worked, but also caused BP's onshore engineering team to realize that the situation had become delicate and that exerting more pressure on the formation could result in further cracks.  After reaching a depth of 18,360 feet, BP informed its lease partners that "well integrity and safety" issues required the rig to stop digging further.

106.    In order to recover oil and gas from the site, BP needed to prepare the well by lowering a casing into it and cementing it into place.  According to a June 19, 2010 WALL STREET JOURNAL article entitled *BP Relied on Cheaper Wells*, "BP's design team originally planned to use a "long string" production casing – a single continuous wall of steel between the wellhead on the seafloor, and the oil and gas zone at the bottom of the well."  A review of MMS records has shown that BP used the long string method significantly more often than most of its peers, even though the other major well design, which is more expensive, includes more safeguards against natural gas blowouts.

107.    On April 14 and 15, after using computer models to evaluate the likely outcome of the cementing job, BP's engineers, working in conjunction with a Halliburton engineer, concluded that the long string could not be cemented reliably.  An internal BP document recommended using a different method, giving four reasons against using a single string casing. They were:

a)      "Cement simulations indicate it is unlikely to be a successful cement job due to formation breakdown."

b)      "Unable to fulfill MMS regulations of 500' of cement above top [hydrocarbon] zone."

c)      "Open annulus to the wellhead, with . . . seal assembly as only barrier."

d)      "Potential need to verify with bond log, and perform remedial cement job(s)."

108.    That conclusion, however, met resistance within BP, and the engineers were encouraged to engage an in-house BP cementing expert to review Halliburton's recommendations. After consulting with this expert, the engineers returned to the initial plan to install a long string casing. On June 14, 2010, the Chairmen of the House Committee on Energy and Commerce and the House Subcommittee on Oversight and Investigations wrote a letter to Hayward discussing BP's decisions in drilling the well, and stated that "[t]he decision to run a single string of casing appears to have been made to save time and reduce costs." On April 15, BP estimated that using the long string approach saved approximately $7-10 million dollars, and calls that method the "[b]est economic case and well integrity case for future completion operations." In an internal BP email released by a Congressional committee, a BP drilling engineer in Houston told colleagues that the long-string design "saves a good deal of time and money."

109.    Devices called "centralizers" are critical to ensure a good cement job by ensuring that the casing string is evenly centered in the wellbore. BP's original design had called for 16 or more centralizers to be placed along the long string, but BP's supplier had only six in stock. A Halliburton engineer named Jesse Gagliano ran a computer simulation suggesting that the Macondo production casing would need more than six centralizers to ensure an even cementing job. According to his simulations, using ten centralizers would result in a "MODERATE" gas flow problem, and that it would require 21 centralizers to achieve only a "MINOR" gas flow

problem.  He informed BP of these results and recommended that twenty-one centralizers be used.

110.    BP Well Team Leader John Guide objected to the use of additional centralizers, writing in an email that, "it will take 10 hours to install them. . . . I do not like this and . . . I [am] very concerned about using them."  Guide's view ultimately prevailed.  On April 16, a BP engineer wrote an email in which he stated:

> Even if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it. But, who cares, it's done, end of story, will probably be fine and we'll get a good cement job.  I would rather have to squeeze than get stuck. . . . So Guide is right on the risk/reward equation.

111.    On April 17, Gagliano reran his computer simulations using seven centralizers, and based on this testing warned BP that the well would have "a SEVERE gas flow problem." According to Gagliano, BP was aware of the risks and proceeded with knowledge that his report indicated the well would have a severe gas flow problem.  On April 19, the thirteen thousand foot long casing was cemented in its final position with only six centralizers.

112.    During the installation process, cement pumped into the well passes through a two-way valve called a "float valve."  The float valve is kept propped open by a device called an "auto-fill tube."  Once the auto-fill tube is pushed downward, the float valve turns into a one-way valve, which is necessary in order to ensure a smooth, unidirectional flow of cement and prevent any fluids from reversing direction and coming back up the casing.  The auto-fill tube is supposed to be pushed down, and the float valve is supposed to convert to a one-way valve, once the tube is subjected to approximately 600 pounds per square inch ("psi").  BP's engineers increased the pressure to 1,800 psi, but could not establish flow.  The rig team decided to increase the pump pressure in discrete increments in an attempt to dislodge the auto-fill tube.

After their ninth attempt, when pump pressure hit 3,142 psi (more than five times the amount of pressure that should have been required), the mud began to flow.

113.    BP's team concluded from the flowing mud that the float valves had converted to one-way valves, but noted another anomaly.  A BP subcontractor had estimated that it would take 570 psi of pressure to circulate mud after converting the float valves, but at this point the circulation pressure was only 340 psi.   Nonetheless, BP's Well Site leader decided that the pressure gauge was broken, and that the float valve had converted.  BP was now ready to pump cement down the casing to complete the primary cement job.

114.    Due to the BP engineer's concerns regarding the fragility of the rock formation, they imposed a number of constraints on the cementing design proposed by Halliburton, the company that was carrying out the cementing job.

a)      *First*, BP limited the amount of drilling mud that would circulate through the wellbore before cementing.  The American Petroleum Institute recommends that enough mud would be pumped into the wellbore to bring the mud originally at the bottom of the well all the way up to the rig, which clears the wellbore of debris and allows technicians on the rig to test the mud for gas influxes and safely remove pockets of gas.  BP, however, circulated only approximately 350 barrels of mud before cementing, rather than the 2,760 barrels needed for a full circulation.

b)      *Second*, BP limited the rate at which cement would be pumped down into the well at four barrels or less per minute, even though higher flow rates tend to increase the efficiency of the cementing.

c)   *Third*, BP limited the volume of cement that Halliburton would pump down the well.  BP determined that the cement column should extend only 500 feet above the uppermost hydrocarbon-bearing zone (and 800 feet above the main hydrocarbon zone).  This violated BP's own internal guidelines, which specify that the top of the annular cement should be 1,000 feet above the uppermost hydrocarbon zone.  According to internal BP documents cited by the Presidential Commission, BP's own engineers recognized that the relatively small amount of cement that would be pumped down the well would leave little margin for error.

d)   *Finally*, BP chose to use a blend of cement called "nitrogen foam cement" – a cement formula that has been leavened with tiny bubbles of nitrogen gas – because this blend is lighter and would exert less pressure on the rock formation.  BP had little experience with this technology.  Cement slurry must be tested before it is used in a cement job.  On March 8, BP had received lab results showing that the slurry to be used in the Macondo well was unstable, but according to the Presidential Commission there is no evidence that BP examined this data.  According to BP's *Deepwater Horizon Accident Investigation Report*, "[t]he evidence reviewed suggests that the cement slurry was not fully tested prior to the execution of the cement job," and "important aspects of the foam cement design, such as foam stability, possible contamination effects and fluid loss potential did not appear to have been critically assessed in the pre-job reviews."

115.   In addition, BP chose not to deploy a casing hanger lockdown sleeve that would have prevented the well's seal from being blown out from below.

116.    A team of outside engineers was onsite to conduct a test called a cement bond log, a test of the integrity of cement in the annular space around a casing.  This test measures whether and to what extent cement and bonded to the outside of the casing and formation, and the location and severity of any channels through the cement.  Despite the problems that BP had encountered drilling the well and the compromises that it had made in the cementing job, it decided against conducting this test and told the engineers that their services were not needed. An independent expert consulted by the House Subcommittee on Oversight and Investigations said that it was "unheard of" not to perform a cement bond log on a well using a single casing approach, and called this decision "horribly negligent."  MMS regulations also direct a cement bond log or equivalent test.

117.    As House Energy and Commerce Committee chairman Henry Waxman and House Subcommittee on Oversight and Investigations chairman Bart Stupak stated in a June 14, 2010 letter to Hayward:

> In spite of the well's difficulties, BP appears to have made multiple decisions for economic reasons that increased the danger of a catastrophic well failure. In several instances, these decisions appear to violate industry guidelines and were made despite warnings from BP's own personnel and its contractors. In effect, it appears that BP repeatedly chose risky procedures in order to reduce costs and save time and made minimal efforts to contain the added risk.

118.    Waxman and Stupak identified five crucial decisions that BP had made, namely; (1) "the decision to use a well design with few barriers to gas flow;" (2) "the failure to use a sufficient number of centralizers to prevent channeling during the cement process;" (3) "the failure to run a cement bond log to evaluate the effectiveness of the cement job;" (4) "the failure to circulate potentially gas-bearing drilling muds out of the well;" and (5) "the failure to secure the wellhead with a lockdown sleeve before allowing pressure on the seal from below," and noted that, "[t]he common feature of these five decisions is that they posed a trade-off between

cost and well safety."  They wrote that, "Time after time, it appears that BP made decisions that increased the risk of a blowout to save the company time or expense."

119.    Similarly, the Presidential Commission concluded that "there is nothing to suggest that BP's engineering team conducted a formal, disciplined analysis of the combined impact of [the Macondo well's] risk factors on the prospects for a successful cement job.  There is nothing to suggest that BP communicated a need for elevated vigilance after the job."  Indeed, the Presidential Commission found that BP's identifiable mistakes "reveal such systematic failures in risk management that they place in doubt the safety culture of the entire industry."  The Presidential Commission identified a number of critical decisions that BP made which increased the risk to the well, including (1) not waiting for more centralizers of preferred design; (2) not running a cement evaluation log; (3) using spacer made from combined lost circulation materials; (4) displacing mud from the riser before setting a surface cement plug; (5) setting the surface cement plug 3,000 feet below the mud line; (6) not installing additional physical barriers during the temporary abandonment procedure; and (7) not performing further well integrity diagnostics in light of troubling and unexplained negative pressure test results.  It found that none of these decisions "appear to have been subject to a comprehensive and systematic risk-analysis, peer-review, or management of change process.  The evidence now available does not show that the BP team members . . . responsible for these decisions conducted *any* sort of formal analysis to assess the relative riskiness of available alternatives." (emphasis in original)

120.    In the push to complete the well, there were so many last-minute changes to the temporary abandonment procedure plan that on April 17, BP Team Leader John Guide emailed David Sims, BP's drilling operations manager, that, "[O]ver the past four days there has been so many last minute changes to the operation that the WSL's have finally come to their wits end.

The quote is 'flying by the seat of our pants.' . . . What is my authority?  With the separation of engineering and operations, I do not know what I can and can't do.  The operation is not going to succeed if we continue in this manner."

121.    At 5:00 pm on April 20, the crew of the *Deepwater Horizon* performed a negative pressure test, a test to check the integrity of the casing and the cement job at the bottom of the well.  As part of a negative pressure test, the crew removes pressure from inside the well to see if fluids leak in, past or through the cement at the bottom of the well.  A negative pressure test is successful if closing the well at the surface results in no pressure build-up inside the well and if there is no flow out of the well for a sustained length of time.

122.    The crew ran the drill pipe down to 8,367 feet below sea level and then pumped a "spacer" – a liquid mixture intended to separate heavy drilling mud from seawater – following by seawater down the drill pipe.  This was intended to push the drilling mud that was currently in the wellbore up above the blowout preventer at the top of the well.  The spacer fluid that BP used was unusual.  BP directed mud engineers on the *Deepwater Horizon* to formulate a spacer out of leftover lost circulation materials that were already on the rig, so as to avoid environmental regulations that it would have to obey if it brought those materials back to shore.  As the Presidential Commission found, this formula "had never previously been used by anyone on the rig or by BP as a spacer, nor [had it] been thoroughly tested for that purpose."

123.    Once the crew had pushed the mud in the wellbore above the blowout preventer, they attempted to perform the negative-pressure test.  They opened the drill pipe and tried to bleed off the pressure in the well down to zero, but initially could not get it below 266 psi.  When they closed the drill pipe, the pressure jumped back up to 1,262 psi.  On a second attempt they were able to bleed the pressure down to 0 psi, but it built back to 773 ppi when they closed the

drill pipe again.  On their third try, they were again able to bring the pressure down to 0 psi, but the pressure increased back to 1,400 psi when the drill pipe was shut.

124.    A BP well site leader decided to perform a second negative pressure test, this one monitoring the pressure on the kill line (a pipe running from the rig to the blowout preventer which is used to circulate fluids into and out of the well at the sea floor).  The pressure on the kill line and the drill pipe should have been identical, but there was a discrepancy between the two.  The crew was able to bleed the pressure on the kill line down to 0 psi with no flow or buildup of pressure, but the pressure on the drill pipe remained at 1,400 psi.  This indicated that there was a leak in the well.  Nonetheless, at 8:00 PM, BP's well site leaders declared that the test had been a success and that the well's integrity was confirmed.  The crew began pumping the drilling mud and spacer in the riser back up into the rig.

125.    At around 9:00 PM, the pressure in the drill pipe began to slowly increase, even though the pump rate was being kept constant.  At 9:08 PM, the crew shut down the pumps for six minutes, during which the pressure in the drill pipe ***continued*** to increase.  Around 9:40 PM, drilling mud began to spew up onto the rig floor, altering the crew that a "kick" (an unplanned influx of gas or fluids) was occurring in the well.  When gaseous hydrocarbons in a kick rise up through a well-bore they expand at accelerating speed, such that a barrel of natural gas at Macondo could expand over a hundredfold in the time it took to travel between the wellhead and the rig.  While the crew took immediate action to shut in the well, at this point gas was already above the blowout preventer, shooting up the riser and expanding rapidly.  The first explosion occurred at approximately 9:49 PM.  Eleven crew members were killed and sixteen were seriously injured.  On April 22, roughly 36 hours after the first explosion, the *Deepwater Horizon* sank to the bottom of the Gulf of Mexico.

126.   In a regional oil spill response plan for the Gulf of Mexico that BP had filed with the MMS, BP had represented that it had the capability to deal with oil spills even worse than the Macondo spill, expressly stating that BP had its contractors possessed "necessary spill containment and recovery equipment to respond effectively to spills" and that it could recover approximately 491,721 barrels of oil per day, such that even the "worst case scenario" of a spill of 250,000 barrels per day would be manageable.   These representations turned out to be entirely false.   In fact, BP was woefully underprepared to deal with the consequences of its reckless safety practices.   In particular:

a)   The Presidential Commission found that BP's oil spill removal organization was "quickly outmatched" and that "If BP's response capacity was underwhelming, some aspects of its response plan were embarrassing."   For example, the plan listed species that do not live in the Gulf of Mexico as being species of concern in the area, and listed a deceased wildlife expert as a person that it would rely upon in the event of a spill.

b)   The Presidential Commission found that, "BP had no available, tested technique to stop a deepwater blowout other than the lengthy process of drilling a relief well. . . . Within a week of the explosion, BP embarked on what would become a massive effort to generate containment options, either by adapting shallow-water technology to the deepwater environment, or by designing entirely new devices."

c)   One of the methods through which BP attempted to stop the flow of oil was through the use of a containment dome known as a cofferdam.   BP, in a presentation to the Department of the Interior, described the possibility of success as "Medium/High."   However, BP had not developed a plan to prevent hydrates

47

from forming in the cofferdam during installation.  On May 7, BP tried to lower the cofferdam onto the leak only to have it fill with oil and gas and become buoyant.  The dome full of flammable materials began to float toward the ships on the surface, but potential disaster was averted when the engineers regained control and moved it to the sea floor.  One BP executive commented that, "if we had tried to make a hydrate collection contraption, we couldn't have done a better job."

d)   By mid-June, BP had two collection vessels – the *Discoverer Enterprise* and the *Q4000* – in place collecting oil from the well.  These two vessels were together able to collect approximately 25,000 barrels of oil per day.  Yet even they were insufficient to fully stem the flow from the well.

127.   In a November 9, 2010 interview with the BBC, Hayward admitted that BP lacked a sufficient oil spill response plan and that "we were making it up day to day."

128.   It took 87 days for BP to stop the flow of oil, during which time approximately 5 million barrels (more than 206 million gallons), spilled into the waters of the Gulf of Mexico.

### H.   DEFENDANTS PUBLICLY MISREPRESENT THEIR ESTIMATES OF THE SPILL'S VOLUME

129.   In the aftermath of the explosion, information regarding the rate of oil flowing from the well was highly material to BP investors, because the volume of the spill was one of the critical factors in assessing the costs of the disaster.  Not only would the amount of oil spilled directly affect clean-up costs, it was also a factor in determining BP's liabilities under the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq.* and the Clean Water Act, 33 U.S.C. § 1251 *et seq.*  Under the Clean Water Act alone, BP faced fines of as much as $4,300 for every barrel of oil spilled.  Investors and the public were entitled to rely on BP to be honest and forthright on this critical point.

130.     According to a civil complaint filed by the SEC, BP developed a number of internal estimates of the oil spill rate soon after the disaster began and was alerted to outside estimates as well.

a)      By April 22, a BP engineer had modeled possible oil flow path scenarios within the well, leading to spill rates between 64,000 and 146,000 bopd;

b)      By April 24, BP was aware of an estimate that, immediately following the explosion, oil was flowing through the riser at a rate of approximately 100,000 bopd;

c)      By April 25, BP engineers were told of an external analysis concluding that the flow rate could be as high as 10,000 bopd; and

d)      On April 27, a BP engineer estimated the flow at approximately 5,000 to 22,000 bopd based on factors including temperature readings on the riser pipe.

131.     In addition to the above, on April 26, 2010, BP produced an internal memoranda entitled "Estimation of the Oil Released from Deepwater Horizon Incident," which stated, in a section called, "Estimated Present Volume Release Rate," that the oil released from the well was "roughly 5000 bbl/day."

132.     The government formed a unified command to respond to the explosion and spill, consisting of the Coast Guard and Mineral Management Service in collaboration with BP.  On April 25, Unified Command announced that the riser was leaking oil at a rate of 1,000 bopd per day.  The Presidential Commission Report found that "This number appears to have come from BP, although how it was calculated remains unclear."  On April 26, a senior NOAA scientist wrote a memorandum estimating the flow rate at 5,000 bopd.  This memorandum was circulated within Unified Command, and was received by at least one BP senior executive, BP America

Vice President of Exploration for the Gulf of Mexico David Rainey.  Rainey undertook the task of creating a BP flow rate estimate, despite the fact that he had no prior experience calculating oil spill flow rates.  After consulting Wikipedia, the NOAA memo, and other sources, by April 28 Rainey developed his own methodology for estimating flow rates which did not comply with established industry standards.  Furthermore, in applying this methodology to the Gulf of Mexico, Rainey made a number of mathematical and procedural mistakes.  A document produced by Rainey on April 27, 2010 showed a "low" estimate of 1,063 barrels emitted per day, a "best guess" estimate of 5,758 barrels emitted per day, and a "high" estimate of 14,268 barrels emitted per day.

133.    While the other estimates available to BP did not reach any single identifiable consensus, Defendants had no basis to believe that an estimate of 1,000 - 5,000 bopd was superior to the others, aside from the fact that it was the range most favorable to BP.  Yet in its public statements regarding the spill, BP chose to use that range repeatedly without even mentioning the contrary data that was available to it.  For example, in Forms 6-K that BP filed with the SEC on April 29 and April 30, BP stated that the volume of the flow was "currently estimated at up to 5,000 barrels a day[.]"  And on an April 29 appearance on CBS's 'The Early Show,' Defendant Suttles stated that, "I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today."

134.    In fact, the 5,000 bopd estimate vastly underestimated the amount of oil spilling from the well.  To rely on the 5,000 bopd estimate without also disclosing the existence of the higher estimates that were available to BP misled investors as to the potential volume of the spill and BP's potential liability.  Furthermore, Defendants did not disclose that even Rainey's analysis contemplated that the spill rate could be as high as 14,268 bopd.

135.   In addition to the above, according to the SEC complaint, throughout the relevant period, BP either generated or was made aware of at least eleven other pieces of data, estimates, and calculations all showing a range of flow rates significantly higher than 5,000 bopd.

a)   On April 30, 2010, an analysis performed by a BP engineer found possible flow rates ranging from 5,000 bopd to 40,000 bopd;

b)   In early May 2010, a video analysis by a BP engineer resulted in an estimate of 20,000 bopd;

c)   On May 9, 2010, a BP contractor modeled possible flow rates ranging from 37,000 to 87,000 bopd;

d)   On May 10, 2010, a video analysis by a BP contractor found that it could not be "ruled out" that the flow rate of oil leaking from the riser pipe was "in the order of 40,000 bopd;"

e)   On or about May 10-11, 2010, a reservoir model by a BP engineer found potential flow rate estimates from 14,000 bopd to 96,000 bopd;

f)   From May 14-15, 2010, a BP engineer authored a critique of a Purdue University professor's analysis estimating the flow rate at 70,000 bopd.  The critique yielded a revised estimate of 15,000 bopd, from which the BP engineer stated that a further reduction appropriately could be made;

g)   On May 16, 2010, a reservoir depletion/pressure drop analysis by a BP engineer found a flow rate estimation of 86,600 bopd, based on the pressure of the flow;

h)   On May 19-20, 2010, a collection of a portion of the oil spilling from the riser pipe showed average collection rates of approximately 5,000 bopd in just a 12-

hour period, indicating that the total amount of oil leaking per day was well in excess of 5,000 barrels;

i)      On May 22, 2010, an external surface expression analysis showed a range of estimate flow rates from 6,154 to 11,609 bopd;

j)      On May 23, 2010, an analysis created by a BP engineer of the flow rate attributable only to the flow produced by a 'kink' in the riser pipe found an estimate of 11,600 bopd; and

k)      On May 24, 2010, BP collected approximately 6,100 barrels of oil during a 24-hour period, despite the fact that it was not collecting all of the oil spilling from the well.

136.    Each of these data points was evidence that the amount of oil flowing from the well was in excess of the 5,000 bopd figure promulgated by BP, and some of the data points suggested that the 5,000 bopd figure vastly underestimated the true scope of the spill.  Yet as the public, government and investors demanded answers as to how much damage the spill was doing and what the ultimate scope of BP's liability would be, BP continued to stand by the 5,000 bopd estimate without acknowledging that the mounting scientific evidence that the spill rate was potentially much higher.  From April 29 through May 22, in SEC filings, press conferences and interviews, and even in Congressional testimony, Defendants repeatedly asserted the 5,000 bopd figure as the best available estimate with no mention of the competing, higher estimates.  For example, on May 14, 2010, Defendant Suttles appeared on ABC's 'Good Morning America' program to discuss the spill.  He said that,

> [W]hat we're focused on is, you know, stopping the flow and minimizing the impact.  And since the beginning, we've said, you know it's, it's almost impossible to get a precise number.  ***But ourselves and people from NOAA and others believe that something around 5,000, that's actually barrels a day, is the***

***best estimate.*** And we look at that.  Not only do we, we, we look at what's occurring on the seabed, we look at what's occurring on the surface.  And actually we know that on the good weather days when we can apply all of our tools, we can actually shrink the size of this spill.  ***And those are the, the ways we actually think that that's probably a reasonable number.*** But we know it's highly uncertain.

137.    Also, on May 14, 2010, on CNN.com, BP again asserted that 5,000 bopd was the best estimate available and disputed a claim by a Purdue University professor that the flow rate was as high as 70,000 barrels per day.  Defendant Dudley, who at that time was BP's Managing Director, claimed that the 70,000 bopd figure was "not accurate at all" and "isn't anywhere I think within the realm of possibility now."

138.    As of May 14, 2010, BP had learned of or generated numerous separate estimates indicating that the spill rate was considerably higher than 5,000 bopd.  To stand by the 5,000 bopd figure without so much as mentioning this contrary data was, at a minimum, an omission of material information that was necessary to make the statements at issue not misleading.

139.    In some instances BP attempted to legitimize the 5,000 bopd figure by claiming a government imprimatur.  For example, in Dudley's May 14, 2010 comments to CNN, he said, "Again, it's not a BP estimate.  It's a unified command center with NOAA and the Coast Guard." Yet this is unavailing, and in no way immunizes BP from liability, since at the time BP was trying to claim a government stamp of approval on its 5,000 bopd estimate, BP was also withholding critical data regarding the flow rate from the government.  As BP admitted in a subsequent criminal proceeding, "BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command."

140.    Inside BP, personnel were aware that BP's position that 5,000 bopd was the "best estimate" was untenable.  On May 15, 2010, the BP engineer who had created the reservoir

model estimating flow rates at 14,000 bopd to 96,000 bopd (discussed in ¶ 135(e), *supra*) read the CNN.com article discussed above and wrote the following email to a senior executive at BP Exploration:

> I just read an article in CNN (May 14, 2010 1:00 pm) stating that a researcher at Purdue believes that the Macondo well is leaking up to 70,000 bopd and that BP stands by a 5,000 bopd figure.  With the data and knowledge we currently have available we cannot definitively state the oil rate from this well.  ***We should be very cautious standing behind a 5,000 bopd figure as our modeling shows that this well could be making anything up to ~100,000 bopd depending on a number of unknown variables***, such as: flow path either through the annulus behind the production casing or through the production casing float shoe, the height of reservoir exposed, if drill pipe is suspended in the [blowout preventer] and sealed by [variable bore] rams, reservoir skin damage, choking effects and etcetera.  We can make the case for 5,000 bopd only based on certain assumptions and in the absence of other information, such as a well test.

141.    On May 19, 2010, the National Incident Command created an interagency Flow Rate Technical Group ("FRTG") comprised of government and non-government scientists and charged it with estimating the oil flow rate in the Gulf of Mexico.  The FRTG published its first estimate on May 27, 2010, stating, "The only range of flow rates that is consistent with all 3 of the methods considered by the FRTG is 12,000 to 19,000 barrels per day.  Higher flow rates [of up to 25,000 barrels per day] are consistent with the data considered by one of the teams."  On August 2, 2010, the FRTG publicly released its final estimates, concluding that the flow rate ranged from 52,700 bopd to 62,200 bopd during the course of the leak, and that approximately 4.9 million barrels of oil (206 million gallons) had flowed from the well.

## I.    BP PLEADS GUILTY TO CIVIL CHARGES REGARDING ITS POST-SPILL OIL FLOW ESTIMATES

142.    On November 15, 2012, the SEC filed a civil complaint in the Eastern District of Louisiana, *Securities and Exchange Commission v. BP plc*, No. 2:12-cv-2774.  In the complaint, the SEC alleged that in three public filings furnished to the SEC and made available to investors, BP misled investors by misrepresenting and omitting material information known to BP

regarding the rate at which oil was flowing into the Gulf and thus, the resulting liability for the oil spill.  Specifically, the complaint alleged that by April 28, 2010, BP possessed at least four internal pieces of data, estimates, or calculations and one external calculation that showed potential flow rates significantly higher than 5,000 bopd, including an April 24 estimate that, immediately following the explosion, oil was flowing through the riser at a rate of approximately *100,000* bopd.  Nonetheless, in three reports on Form 6-K that BP filed on April 29, April 30, and May 4 2010, BP stated that flow rate estimates were at only 5,000 bopd without even disclosing the existence of this contrary data.

143.    On that same day, BP filed a consent to the entry of a final judgment ordering BP to pay a $525 million civil penalty and permanently restraining and enjoining BP from violations of Section 10(b) of the Exchange Act.  In this consent, BP agreed "not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis[.]"  According to an SEC press release, BP's $525 million penalty was the third-largest in the history of the agency.

### J.    BP PLEADS GUILTY TO CRIMINAL CHARGES FOR MISLEADING CONGRESS, ENVIRONMENTAL POLLUTION AND FELONY MANSLAUGHTER

144.    On January 29, 2013, a federal judge accepted BP's criminal guilty plea for illegal conduct leading up to and following the *Deepwater Horizon* disaster.  BP pled guilty to each count charged in a 14 count information, including 11 counts of felony manslaughter, one count of felony obstruction of Congress and violations of the Clean Water and Migratory Bird Treaty Acts, and was sentenced to pay $4 billion in criminal fines and penalties.  During the guilty plea and sentencing proceedings, the court found that the fines far exceeded any imposed in U.S.

history.   The guilty plea agreement was signed by counsel for BP and its subsidiaries BP Exploration and BP Corporation North America Inc.

145.   In the guilty plea agreement, BP agreed that if the case were to proceed to trial, the government could establish beyond a reasonable doubt that BP "as the designated operator under BOEMRE regulations, was ultimately responsible for conducting operations at Macondo in a way that ensured the safety and protection of personnel, equipment, natural resources, and the environment."   BP also agreed that on or about April 20, 2010, a negative pressure test performed on the Macondo well provided multiple indications that the wellbore was not secure, that BP's well site leaders negligently supervised the negative pressure test and deemed it to be a success, and that the negligent conduct of BP's well site leaders was attributable to BP.

146.   Regarding BP's misrepresentations regarding the volume of the spill, BP agreed that the government could establish beyond a reasonable doubt that:

> On or about May 24, 2010, in the Eastern District of Louisiana and elsewhere, BP did corruptly, that is, with an improper purpose, endeavor to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which an inquiry and investigation was being had by a Committee of the United States House of Representatives into the amount of oil flowing from the Macondo Well ("flow rate") through the following omissions and false and misleading statements in its May 24, 2010 response ("Markey Response") to the Committee on Energy and Commerce:
>
> 1.   BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD.
>
> 2.   BP, through a former vice president, withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.
>
> 3.   BP, through a former vice president, falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology.  At the time that this false representation was made, BP's former vice president knew that those estimates were the product of a

methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation.

4.      BP, through a former vice president, falsely represented that the flow-rate estimates included in the Markey Response had played "an important part" in Unified Command's decision on April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD.  At the time this false representation was made, BP's former vice president knew that those flow-rate estimates had not played "an important part" in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision.

5.      BP falsely suggested, in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results."  In fact, as set forth above, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.

6.      On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent "pressure data was obtained from the BOP stack."  At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010.

BP's former vice president's knowledge and actions are attributable to BP.

## V.     DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS

147.    During the relevant period, Defendants made materially false and misleading statements about (1) BP's emphasis on safety and progress in implementing the Baker Report's recommendations across its operations; (2) BP's OMS, which was supposedly a system applied across all of BP's lines of business worldwide so as to standardize its safety practices; and (3) statements made after the April 20, 2010 Deepwater Horizon explosion regarding BP's estimates of the magnitude of the oil spill.

### A.   NOVEMBER 7, 2007 SPEECH

148.    On November 7, 2007, in a speech before the Houston Forum on 'Energy Security and America' Defendant Hayward stated that:

> [I]t would be remiss of me not to mention the tragedy at Texas City, an event which marks a turning point in BP's history.  We continue to implement the roadmap provided to ourselves and the industry by the excellent work of the Baker Panel.  BP remains absolutely committed to taking these lessons and becoming a world leader in process safety.

149.    These remarks were subsequently published to a worldwide audience on BP's website.  This statement was false and misleading when made for the following reasons, amongst others: (1) BP did not implement needed safety reforms as per the Baker Report's recommendations and as a result continued to experience chronic safety lapses and near-disasters (§IV.D); (2) BP was still receiving repeated fines and warnings from regulators regarding widespread and serious safety violations (§IV.E); and (3) in direct violation of the Baker Report's recommendations to foster a "positive, trusting, and open process safety culture" BP was continuing to retaliate against whistleblowers who raised safety concerns (§IV.F).  In short, while BP was representing itself as being committed to safety reform, its statements are belied by its conscious failure to actually implement such reforms.   The Presidential Commission identified the reason for this failure:  BP's desire to minimize costs outweighed its desire to maximize safety.

### B.   FEBRUARY 22, 2008 ANNUAL REVIEW

150.    On February 22, 2008, BP released its 2007 Annual Review.  In a section entitled "Group chief executive's review," Defendant Hayward represented that:

> [W]hen I took over as group chief executive, the immediate task was to restore the integrity and the efficiency of BP's operations.  I set out three priorities: safety, people and performance.

151.    This statement was false and misleading when made for the following reasons, amongst others: (1) BP did not implement needed safety reforms as per the Baker Report's recommendations and as a result continued to experience chronic safety lapses and near-disasters (§IV.D); (2) BP was still receiving repeated fines and warnings from regulators regarding widespread and serious safety violations (§IV.E); and (3) in direct violation of the Baker Report's recommendations to foster a "positive, trusting, and open process safety culture" BP was continuing to retaliate against whistleblowers who raised safety concerns (§IV.F).

### C.    FEBRUARY 27, 2008 CONFERENCE CALL STATEMENTS

152.    On February 27, 2008, in a conference call with investors and analysts regarding BP's strategy for 2008, Defendant Hayward represented that:

> Notwithstanding this track record our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations. . . . Safe and reliable operations remain our number one priority.

153.    This statement was false and misleading when made for the following reasons, amongst others: (1) BP did not implement needed safety reforms as per the Baker Report's recommendations and as a result continued to experience chronic safety lapses and near-disasters (§IV.D); (2) BP was still receiving repeated fines and warnings from regulators regarding widespread and serious safety violations(§IV.E); and (3) in direct violation of the Baker Report's recommendations to foster a "positive, trusting, and open process safety culture" BP was continuing to retaliate against whistleblowers who raised safety concerns(§IV.F).

154.    In addition, Hayward's representation that OMS was being implemented across "all of BP's operations" was false for the following reasons, amongst others: (1) BP had made a conscious decision to apply OMS to contractor-owned assets (including the majority of its Gulf of Mexico operations) in a very different manner than it was applied to BP-owned assets (¶¶72-

81); (2) BP had made a conscious decision to exempt contractor-owned assets from OMS reporting and audit requirements (¶¶74; 76-78); and (3) to the extent that OMS did apply to contractor-owned assets, it focused primarily on personal safety as opposed to the process safety concerns that investors were most concerned with, and which had been the focus of the Baker Report (¶¶79-80).

### D.   APRIL 17, 2008 SPEECH

155.    On April 17, 2008, in a speech at BP's 2008 Annual General Meeting, Defendant Hayward represented that:

> When I took over as chief executive last May, I said that we would focus on three basic priorities, safety, people, and performance.  Everyone at BP understands those priorities.  And while I am in this role they will remain the priorities.
>
> Safety is our number one priority and in 2007 our overall safety record continued to improve.  Over the last eight years our safety performance according to the standard industry measure has improved threefold and is now among the best in our industry.
>
> Our intense focus on process safety continues.  We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations.  This is aimed at ensuring that our operations across the world look and feel the same everywhere – and perform to the same high standard.

156.    This speech was subsequently published to a worldwide audience on BP's website.    This statement was false and misleading when made for the following reasons, amongst others: (1) BP did not implement needed safety reforms as per the Baker Report's recommendations and as a result continued to experience chronic safety lapses and near-disasters (§IV.D); (2) BP was still receiving repeated fines and warnings from regulators regarding widespread and serious safety violations (§IV.E); and (3) in direct violation of the Baker Report's recommendations to foster a "positive, trusting, and open process safety culture" BP was continuing to retaliate against whistleblowers who raised safety concerns (§IV.F).

157.    In addition, Hayward's representation that OMS was being implemented across "all of BP's operations" was false for the following reasons, amongst others: (1) BP had made a conscious decision to apply OMS to contractor-owned assets (including the majority of its Gulf of Mexico operations) in a very different manner than it was applied to BP-owned assets (¶¶72-81); (2) BP had made a conscious decision to exempt contractor-owned assets from OMS reporting and audit requirements (¶¶74; 76-78); and (3) to the extent that OMS did apply to contractor-owned assets, it focused primarily on personal safety as opposed to the process safety concerns that investors were most concerned with, and which had been the focus of the Baker Report (¶¶79-80).

### E.    DECEMBER 17, 2008 SPEECH

158.    On December 17, 2008, in a speech at the HRH Prince of Wales's 3rd Annual Accounting for Sustainability Forum, Defendant Hayward represented that:

> BP had a number of high-profile safety lapses in recent years, notably at our Texas City refinery, where there was tragic and unacceptable loss of life.
>
> These lapses exposed shortcomings – but they also gave us a huge opportunity to learn and improve the way we operate.  We opened ourselves up to scrutiny – and we listened more to our front-line operations people – who, of course, really know what is going on on the ground.  And we have continuously reported progress against a response plan and against an independent external report.
>
> One of the many consequences for us has been to develop and to embed a new Operating Management system right across BP – and we operate in 100 countries – so that is no mean feat.

159.    This speech was subsequently published to a worldwide audience on BP's website.    This statement was false and misleading when made for the following reasons, amongst others: (1) BP did not implement needed safety reforms as per the Baker Report's recommendations and as a result continued to experience chronic safety lapses and near-disasters (§IV.D); (2) BP was still receiving repeated fines and warnings from regulators regarding

widespread and serious safety violations (§IV.E); and (3) in direct violation of the Baker Report's recommendations to foster a "positive, trusting, and open process safety culture" BP was continuing to retaliate against whistleblowers who raised safety concerns (§IV.F).

160.    In addition, Hayward's representation that OMS was being implemented "right across BP" was false for the following reasons, amongst others: (1) BP had made a conscious decision to apply OMS to contractor-owned assets (including the majority of its Gulf of Mexico operations) in a very different manner than it was applied to BP-owned assets (¶¶72-81); (2) BP had made a conscious decision to exempt contractor-owned assets from OMS reporting and audit requirements (¶¶74; 76-78); and (3) to the extent that OMS did apply to contractor-owned assets, it focused primarily on personal safety as opposed to the process safety concerns that investors were most concerned with, and which had been the focus of the Baker Report (¶¶79-80).

### F.    FEBRUARY 24, 2009 ANNUAL REVIEW

161.    On February 24, 2009, BP issued its 2008 Annual Review, which contained the following representations from Defendant Hayward in a 'Q&A' portion of the "Group chief executive's review:"

> Q: At the start of the year what priorities did you set out for BP?
>
> Safety, people and performance, and these remain our priorities.  Our number one priority was to do everything possible to achieve safe, compliant and reliable operations.  Good policies and processes are essential but, ultimately, safety is about how people think and act.  That's critical at the front line but it is also true for the entire group.  Safety must inform every decision and every action.  The BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed.

162.    This statement was false and misleading when made for the following reasons, amongst others: (1) BP did not implement needed safety reforms as per the Baker Report's recommendations and as a result continued to experience chronic safety lapses and near-disasters

(§IV.D); (2) BP was still receiving repeated fines and warnings from regulators regarding widespread and serious safety violations (§IV.E); and (3) in direct violation of the Baker Report's recommendations to foster a "positive, trusting, and open process safety culture" BP was continuing to retaliate against whistleblowers who raised safety concerns (§IV.F).

163. In addition, Hayward's representation that OMS governed "how every BP project, site, operation and facility is managed," was false for the following reasons, amongst others: (1) BP had made a conscious decision to apply OMS to contractor-owned assets (including the majority of its Gulf of Mexico operations) in a very different manner than it was applied to BP-owned assets (¶¶72-81); (2) BP had made a conscious decision to exempt contractor-owned assets from OMS reporting and audit requirements (¶¶74; 76-78); and (3) to the extent that OMS did apply to contractor-owned assets, it focused primarily on personal safety as opposed to the process safety concerns that investors were most concerned with, and which had been the focus of the Baker Report (¶¶79-80).

### G.    MARCH 4, 2009 ANNUAL REPORT

164. On March 4, 2009, BP issued its 2008 Annual Report on Form 20-F, which was signed by Defendant Hayward.  In this SEC filing, BP represented that eight sites, including the Gulf of Mexico, had "completed the transition to OMS in 2008."  It also represented that:

> We continue to implement our new operating management system *(OMS), a framework for operations across BP that is integral to improving safety and operating performance in every site.*
>
> When fully implemented, OMS will be the single framework within which we will operate, consolidating BP's requirements relating to process safety, environmental performance, legal compliance in operations, and personal, marine and driving safety….  The OMS establishes a set of requirements, and provides sites with a systematic way to improve operating performance on a continuous basis.  BP businesses implementing OMS must work to integrate group requirements within their local system to meet legal obligations, address local stakeholder needs, reduce risk and improve efficiency and reliability.  A number

of mandatory operating and engineering technical requirements have been defined within the OMS, to address process safety and related risks.

All operated business plan to transition to OMS by the end of 2010. **Eight sites completed the transition to OMS in 2008**; two petrochemical plants, Cooper River and Decatur, two refineries, Lingen and Gelsenkirchen and four Exploration and Production sites, North America Gas, **the Gulf of Mexico**, Colombia and the Endicott field in Alaska…. For the sites already involved, implementing OMS has involved detailed planning, including gap assessments supported by external facilitators. A core aspect of OMS implementation is that each site produces its own 'local OMS', which takes account of relevant risks at the site and details the site's approach to managing those risks. As part of its transition to OMS, a site issues its local OMS handbook, and this summarizes its approach to risk management. Each site also develops a plan to close gaps that is reviewed annually. The transition to OMS, at local and group level, has been handled in a formal and systematic way, to ensure the change is managed safely and comprehensively.

Experience so far has supported our expectation that having one integrated and coherent system brings benefits of simplification and clarity, and that the process of change is supporting our renewed commitment to safe operations.

165.    This statement was false and misleading for the following reasons, amongst others: (1) BP had made a conscious decision to apply OMS to contractor-owned assets (including the majority of its Gulf of Mexico operations) in a very different manner than it was applied to BP-owned assets (¶¶72-81); (2) BP had made a conscious decision to exempt contractor-owned assets from OMS reporting and audit requirements (¶¶74; 76-78); (3) to the extent that OMS did apply to contractor-owned assets, it focused primarily on personal safety as opposed to the process safety concerns that investors were most concerned with, and which had been the focus of the Baker Report (¶¶79-80); (4) Hayward had recently received a report from Inglis indicating the OMS transition in the Gulf of Mexico had not been completed by the end of 2008 (¶69); and (5) Hayward has testified that he did not anticipate that OMS implementation would be complete in the Gulf of Mexico until the end of 2010 (¶75).

166.    BP counsel conceded the falsity of this statement on oral argument at a motion to dismiss hearing on November 4, 2011. *In re BP plc Sec. Litig.*, Transcript Doc. No. 304 at

58:15-21) ("The statement here that the Gulf of Mexico completed the transition to OMS in 2008 - that is a statement of specific fact . . . that the plaintiffs have alleged that I will admit to the Court is not accurate.").

### H. APRIL 16, 2009 SUSTAINABILITY REVIEW

167. On April 16, 2009, BP released its 2008 Sustainability Review. In a section entitled "Group chief executive's review," Defendant Hayward represented that:

> My aim for BP is that its performance should be sustainable – in other words everything we do each day should contribute in some way to the long-term health of BP and that of the environment and society. We measure performance accordingly, not only with financial metrics but also with the data on safety, the environment and employees that you see in this Review. This reflects my top three priorities as chief executive: safety, people and performance. ***You can see a similar balanced approach in our new operating management system (OMS), which is to be implemented at each BP site.*** It covers everything from compliance and risk management through to governance and measuring results.

168. The statement that safety was a top priority for BP was false and misleading when made for the following reasons, amongst others: (1) BP did not implement needed safety reforms as per the Baker Report's recommendations and as a result continued to experience chronic safety lapses and near-disasters (§IV.D); (2) BP was still receiving repeated fines and warnings from regulators regarding widespread and serious safety violations (§IV.E); and (3) in direct violation of the Baker Report's recommendations to foster a "positive, trusting, and open process safety culture" BP was continuing to retaliate against whistleblowers who raised safety concerns (§IV.F).

169. In addition, Hayward's representation that OMS governed "is to be implemented at each BP site," was false for the following reasons, amongst others: (1) BP had made a conscious decision to apply OMS to contractor-owned assets (including the majority of its Gulf of Mexico operations) in a very different manner than it was applied to BP-owned assets (¶¶72-81); (2) BP had made a conscious decision to exempt contractor-owned assets from OMS

reporting and audit requirements (¶¶74; 76-78); and (3) to the extent that OMS did apply to contractor-owned assets, it focused primarily on personal safety as opposed to the process safety concerns that investors were most concerned with, and which had been the focus of the Baker Report (¶¶79-80).

### I.     FEBRUARY 26, 2010 ANNUAL REVIEW

170.    On February 26, 2010, BP issued its 2009 Annual Review, which contained the following representations:

> Safe, reliable and compliant operations remain the group's first priority.  A key enabler for this is the BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency.  Alongside mandatory practices to address particular risks, OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework.

171.    SEEAC was required to review the 2009 Annual Review and make recommendations regarding its language to the board before it could be placed before shareholders.  As both the executive liaison to SEEAC and a member of the BP board of directors, Hayward was involved in the making of this statement and ordered or approved its making or issuance.  In particular, Hayward was in attendance at a January 26, 2010 meeting of the BP board of directors where this document was discussed prior to its publication.

172.    The statement that safe, reliable and compliant operations were BP's first priority was false and misleading when made for the following reasons, amongst others: (1) BP did not implement needed safety reforms as per the Baker Report's recommendations and as a result continued to experience chronic safety lapses and near-disasters (§IV.D); (2) BP was still receiving repeated fines and warnings from regulators regarding widespread and serious safety violations (§IV.E); and (3) in direct violation of the Baker Report's recommendations to foster a

"positive, trusting, and open process safety culture" BP was continuing to retaliate against whistleblowers who raised safety concerns (§IV.F).

173.    In addition, the representation that OMS "provides a common framework for all BP operations, designed to achieve consistency" was false for the following reasons, amongst others: (1) BP had made a conscious decision to apply OMS to contractor-owned assets (including the majority of its Gulf of Mexico operations) in a very different manner than it was applied to BP-owned assets (¶¶72-81); (2) BP had made a conscious decision to exempt contractor-owned assets from OMS reporting and audit requirements (¶¶74; 76-78); and (3) to the extent that OMS did apply to contractor-owned assets, it focused primarily on personal safety as opposed to the process safety concerns that investors were most concerned with, and which had been the focus of the Baker Report (¶¶79-80).

### J.    MARCH 5, 2010 ANNUAL REPORT

174.    On March 5, 2010, BP filed its 2009 Annual Report with the SEC on Form 20-F, which was signed by Defendant Hayward.  The Form 20-F represented that:

> Safe, reliable and compliant operations remain the group's first priority.  A key enabler for this is the BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency.
>
> *****
>
> This performance follows several years of intense focus on training and procedures across BP.  BP's operating management system (OMS), which provides a single operating framework for all BP operations, is a key part of continuing to drive a rigorous approach to safe operations.  2009 marked an important year in the continuing implementation of OMS.
>
> *****
>
> Our OMS covers all areas from process safety, to personal health, to environmental performance.
>
> *****

Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics and Environment Assurance] committee has observed a number of key developments, including: the establishment of a safety & operations (S&O) function with the highest caliber of staff; development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites; the establishment of training programmes in conjunction with MIT that are teaching project management and operational excellence; the dissemination of standard engineering practices throughout the group; and the formation of a highly experienced S&O audit team formed to assess the safety and efficiency of operations and recommend improvements.  Throughout this time the group chief executive has made safety the number one priority.

175.    The statement that safe, reliable and compliant operations were BP's first priority was false and misleading when made for the following reasons, amongst others: (1) BP did not implement needed safety reforms as per the Baker Report's recommendations and as a result continued to experience chronic safety lapses and near-disasters (§IV.D); (2) BP was still receiving repeated fines and warnings from regulators regarding widespread and serious safety violations (§IV.E); and (3) in direct violation of the Baker Report's recommendations to foster a "positive, trusting, and open process safety culture" BP was continuing to retaliate against whistleblowers who raised safety concerns (§IV.F).

176.    In addition, the representation that OMS provided a single operating framework for all BP operations was false for the following reasons, amongst others: (1) BP had made a conscious decision to apply OMS to contractor-owned assets (including the majority of its Gulf of Mexico operations) in a very different manner than it was applied to BP-owned assets (¶¶72-81); (2) BP had made a conscious decision to exempt contractor-owned assets from OMS reporting and audit requirements (¶¶74; 76-78); and (3) to the extent that OMS did apply to contractor-owned assets, it focused primarily on personal safety as opposed to the process safety concerns that investors were most concerned with, and which had been the focus of the Baker Report (¶¶79-80).

### K. MARCH 23, 2010 SPEECH

177. On March 23, 2010, in a speech at the Peterson Institute for International Economics, Defendant Hayward represented that:

> Five years ago on this day, fifteen people died and many more were injured, when an explosion tore through our Texas City refinery.

> That tragic accident has changed our approach to safety and operations integrity in a profound and fundamental way– providing a safe working environment is a paramount responsibility, and our first and foremost priority.

178. The statement that safe operations were BP's first priority was false and misleading when made for the following reasons, amongst others: (1) BP did not implement needed safety reforms as per the Baker Report's recommendations and as a result continued to experience chronic safety lapses and near-disasters (§IV.D); (2) BP was still receiving repeated fines and warnings from regulators regarding widespread and serious safety violations (§IV.E); and (3) in direct violation of the Baker Report's recommendations to foster a "positive, trusting, and open process safety culture" BP was continuing to retaliate against whistleblowers who raised safety concerns (§IV.F).

### L. APRIL 15, 2010 SUSTAINABILITY REVIEW

179. On April 15, 2010, BP released its 2009 Sustainability Review. In a question & answer section entitled "Group Chief Executive's Review," Defendant Hayward misrepresented the progress that BP had made on safety processes.

> *Question:* What progress has BP made on safety during 2009?

> *Answer:* Safety is fundamental to our success as a company and 2009 was important because of the progress we made in implementing our operating management system (OMS). The OMS contains rigorous and tested processes for reducing risks and driving continuous improvement. I see it as the foundation for a safe, responsible and high-performing BP. ***Having been initially introduced at eight sites in 2008,*** the OMS rollout extended to 70 sites by the end of 2009, including all our operated refineries and petrochemical plants. ***This means implementation is 80% complete.***

69

180.     The statement that safety was fundamental to BP was false and misleading when made for the following reasons, amongst others: (1) BP did not implement needed safety reforms as per the Baker Report's recommendations and as a result continued to experience chronic safety lapses and near-disasters (§IV.D); (2) BP was still receiving repeated fines and warnings from regulators regarding widespread and serious safety violations (§IV.E); and (3) in direct violation of the Baker Report's recommendations to foster a "positive, trusting, and open process safety culture" BP was continuing to retaliate against whistleblowers who raised safety concerns (§IV.F).

181.     In addition, Hayward's statements regarding the scope and implementation of OMS were false for the following reasons, amongst others: (1) BP had made a conscious decision to apply OMS to contractor-owned assets (including the majority of its Gulf of Mexico operations) in a very different manner than it was applied to BP-owned assets (¶¶72-81); (2) BP had made a conscious decision to exempt contractor-owned assets from OMS reporting and audit requirements (¶¶74; 76-78); and (3) to the extent that OMS did apply to contractor-owned assets, it focused primarily on personal safety as opposed to the process safety concerns that investors were most concerned with, and which had been the focus of the Baker Report (¶¶79-80).

### M.     APRIL 24, 2010 UNIFIED COMMAND ANNOUNCEMENT

182.     On April 24, 2010, Unified Command announced that the damaged riser at the Macondo site was leaking oil at the rate of 1,000 barrels per day.  At midnight on April 25, 2010, Unified Command released a press release stating the following:

> The unified command for the Deepwater Horizon Explosion Response announced Saturday that the Mobile Offshore Drilling Unit was located capsized on the sea floor approximately 1500 feet northwest of the well site.  ***Remotely Operated Vehicles located two places where oil is leaking from the well pipe and estimates indicate that up to 1,000 barrels of oil a day could be leaking into the water approximately 5,000 feet below the surface.***

> The unified command, consisting of the Coast Guard and Mineral Management Service, in collaboration with BP, the responsible party, are working round the clock to determine options to contain and secure the spill.

183. Based on the interview of a Coast Guard official, the Presidential Commission found that, "This number appears to have come from BP, although how it was calculated remains unclear." The fact that the statement is attributed in part to data from remotely operated vehicles further confirms that the estimate can be attributed to BP, since on information and belief any such vehicles at the scene of the spill would not have been under direct Coast Guard control.

184. At the time BP provided the 1,000 bopd estimate to Unified Command, BP knew and intended that the estimate would be communicated to the larger public, including investors in BP securities. BP did not, however, provide Unified Command with other and higher estimates that it possessed at that time. As noted in its criminal plea documents, "BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command." (¶146.5) As such, it is appropriate to attribute this statement to BP for the purposes of this action.

185. This statement, which caused BP Ordinary Shares to trade at an inflated price, were false and misleading because Defendants knew or should have known that 1,000 bopd was not, in fact, a reasonable estimate given the information that was then available to them. As of the date of this statement, Defendants had at least two competing estimates showing considerably higher spill rates, including one document showing a "worst case" scenario of 100,000 bopd, and a flow path rate model producing flow rates of 64,000 bopd to 146,000 bopd. (¶¶130(a); 146.6) At a minimum, Defendants failed to disclose material information that was necessary to make this statement regarding the estimated spill rate not misleading. Defendants' specific knowledge of contradictory data made it unreasonable for it to rely wholly upon the 1,000 bopd estimate,

and Defendants were incentivized to minimize the spill rate in order to reduce BP's liability.  *See* §IV.H, *supra*.

     **N.**     **APRIL 27, 2010 EARNINGS CALL**

     186.     On April 27, 2010, BP held an analyst conference call regarding its earnings for the first quarter of 2010.  On this call, the following exchange occurred between Defendant Grote and an analyst:

> Q: Maybe you can give us some kind of indication how much you have already spent in Macondo for us to have some kind of idea of on a daily basis how much this is costing? . . .

> A: I think it's time to take a few moments and just really talk about where we are in the Gulf of Mexico and to describe the response to the Deepwater Horizon incident. I need to note for you that communications are being handled through a joint incident command team, that's led by the U.S. coast guard and that I am only able to speak to information that they have already released, the coast guards providing daily updates which can be accessed via the Internet and IR team would be happy to direct you to website which is www.deephorizonresponse.com if you like to zone into it right now.

> As a background, we believe that all accidents are avoidable; when they do occur a company is judged on how it responds. And as such we are deploying a full resources of the Group to ensure that a tragic accident doesn't become a significant environmental event. ***Currently, the top of the riser's lying on the sea-floor some 500 feet from the well ahead and the flow from the top of the riser appears to be around 1000 barrels a day.*** The response program is across two broad dimensions, stopping the flow of oil and continuing and containing the environmental consequences.

> So there is three activities that were currently progressing to control the oil flow. First, we have five remotely operated vessels working to intervene on the blow-out preventer and get it closed and if we are successful on that and they we've been working on it for several days now. But if we are successful on that, that could resolve the oil flow problem in the short period time.

> Secondly, we are looking to contain the flow by putting in place a large canopy with a riser over the oil leak. This is sort of an inverted funnel and then processing it on the surface with a test separator. This has been engineered in concept and has been previously utilized successfully in shallow water. The issue is to make certain that it can withstand the pressure of the much deeper water at the site. And to be able to sort out the various topsides processing issues, but presuming we can

get all that squared away and remain pretty confident, we can at the current time. This could be a solution in four weeks or less.

And then finally, we've mobilized the rig that we'll shortly spud a relief well in the reservoir and that would take somewhere between two and three months. This, however, is a well that we would be drilling no matter what because the intention would be to not to eventually turn it into a producing well since obviously we have a commercial discovery at the site.

So that's stopping the flow of oil. The second response program is aimed at containing the environmental consequences of the oil that has gotten to the ocean surface. ***In our spill response, we've deployed 32 vessels in five aircraft with a capacity to contain a much bigger spill, hundred times bigger spill than the one we're currently facing.*** The oil that is flowing out of the well, its light, its 37 API and is volatile with a high gas-oil ratio.

At the center of the spill, that's about 3% of the surface area of the wider sheen, the spill has an average thickness of 0.1 millimeter, that's about the width of a human hair and it's subject to skimming operation. So, we got skimmers out there dealing with the central part of the sheen and the wider sheen which has a thickness of one to two hydrocarbon molecules, so it's very tiny. It's being addressed through the use of dispersions.

In addition, we have got booms prepared for deployment to protect the shoreline as a precautionary measure if it gets to that. The response is being managed by the joint incident command team that consists of the coastguard, the MMS, BP and Transocean and it's functioning extremely well with cooperative and productive relationships amongst the participants. So, we are active all fronts here with a number of activities some occurring now and some which will extend over a longer period of time.

This specific cost elements associated with this is something that we have agreed with the joint incident command team that the coast guard will be posting on their website starting soon within the next couple of days. So you'll be able to track what sort of costs are associated with this activity at that stage, but that I can't comment on it at the current time.

Fergus MacLead [BP Head of Investor Relations]: And obviously under the cost of the relief well will cost the same as any other well in the Gulf of Mexico.

Grote: That's sort of $100 million or so?

187.   This statement, which caused BP Ordinary Shares to trade at an inflated price, was false and misleading because Defendants knew or should have known that 1,000 bopd was not, in fact, a reasonable estimate given the information that was then available to them.  As of

the date of this statement, Defendants had multiple competing estimates showing considerably higher spill rates, including a model of possible oil flow scenarios leading to spill rates between 64,000 and 146,000 bopd.  (¶¶130-132; 146.6)  At a minimum, Defendants failed to disclose material information that was necessary to make these statements regarding the estimated spill rate not misleading.  Defendants' specific knowledge of contradictory data made it unreasonable for them to rely wholly upon the 1,000 bopd estimate, and Defendants were incentivized to minimize the spill rate in order to reduce BP's liability.  *See* §IV.H, *supra*.

### O.    APRIL 28-29 2010 PRESS STATEMENTS

188.    On April 28, 2010, a NOAA representative Coast Guard leader Rear Admiral Landry announced during a joint conference with BP that NOAA had increased its estimate of the spill's volume from 1,000 to 5,000 barrels per day.  During this joint press conference, Defendant Suttles reiterated that BP's best estimate was that ***only 1,000 bopd were flowing from the well***.  While Suttles announced that BP had discovered a new point of leakage just beyond the top of the blowout prevented, he also said that "we do not believe this changes the amount currently believed to be released."

189.    On the next day, April 29, 2010, Defendant Suttles conducted several television interviews at which he discussed the oil flow rate and repeated the misleadingly low 1,000 – 5,000 bopd estimates.

    a)    On CBS's 'The Early Show,' he stated that: "I think somewhere between one and five thousand barrels a day is probably the best estimate we have today."

    b)    On ABC's 'Good Morning America,' he stated that: "I think between one and five thousand barrels a day is a reasonable estimate."

    c)      On NBC's 'Today Show,' he stated that "I actually don't think there's a difference between NOAA's view and our view.  I would say the range is 1,000 to 5,000 barrels a day."

190.    These statements, which caused BP Ordinary Shares to trade at an inflated price, were false and misleading because Defendants knew or should have known that 1,000 - 5,000 bopd was not, in fact, a reasonable estimate given the information that was then available to them.  As of the dates of these statements, Defendants had a number of competing estimates showing considerably higher spill rates, and even the document that Defendants relied upon in setting forth the 5,000 bopd estimate showed that the spill rate was potentially as high as 14,266 bopd.  (¶¶130-132; 146.6)  At a minimum, Defendants failed to disclose material information that was necessary to make these statements regarding the estimated spill rate not misleading.  Defendants' specific knowledge of contradictory data made it unreasonable for them to rely wholly upon the 5,000 bopd estimate, and Defendants were incentivized to minimize the spill rate in order to reduce BP's liability.  *See* §IV.H, *supra*.

### P.    APRIL 29-30 SEC FILINGS

191.    In addition to their media statements regarding the spill rate, discussed in §V.O, *supra*, on April 29-30, Defendants also made SEC filings statements regarding the spill rate.  In these filings, Defendants reiterated their representations that the spill rate was estimated at up to 5,000 bopd without mentioning contrary (and much higher) estimates that were also available to BP at that time.  Specifically:

    a)      On April 29, 2010, BP filed a Form 6-K with the SEC, in which BP stated, "Efforts continue to stem the flow of oil from the well ***currently estimated at up to 5,000 barrels per day***."

b)　　On April 30, 2010, BP filed a Form 6-K with the SEC, in which BP stated, "Efforts to stem the flow of oil from the well, *currently estimated at up to 5,000 barrels a day*, are continuing with six remotely-operated vehicles (ROVs) continuing to attempt to activate the flow out preventer (BOP) on the sea bed."

192.　　In addition, on April 30, 2010, BP published on its corporate website a press release titled *BP Steps Up Shoreline Protection Plans on US Gulf Coast*, in which BP repeated its statement that, "Efforts to stem the flow of oil from the well, currently estimated at up to 5,000 barrels a day, are continuing[.]"

193.　　These statements, which caused BP Ordinary Shares to trade at an inflated price, were false and misleading because Defendants knew or should have known that 5,000 bopd was not, in fact, a reasonable estimate given the information that was then available to them.  As of the dates of these statements, Defendants had a number of competing estimates showing considerably higher spill rates, and even the document that Defendants relied upon in setting forth the 5,000 bopd estimate showed that the spill rate was potentially as high as 14,288 bopd. (¶¶130-132; 146.6)  At a minimum, Defendants failed to disclose material information that was necessary to make these statements regarding the estimated spill rate not misleading. Defendants' specific knowledge of contradictory data made it unreasonable for them to rely wholly upon the 5,000 bopd estimate, and Defendants were incentivized to minimize the spill rate in order to reduce BP's liability.  *See* §IV.H, *supra*.

194.　　In the SEC proceedings described in §IV.I, *supra*, BP admitted that the statements in its April 29-30 Forms 6-K constituted violations of Section 10(b) of the Exchange Act and Rule 10b, and that "BP knew, or was severely reckless in not knowing, the above-mentioned

filings with the Commission and statements to the public contained material misrepresentations and omissions."

### Q.  MAY 4, 2010 SEC FILING

195.  On May 4, 2010, BP filed a Form 6-K with the SEC, in which BP stated, "[C]urrent estimates by the U.S. National Oceanic and Atmospheric Administration (NOAA) suggest *some 5,000 barrels (210,000 U.S. gallons) of oil per day* are escaping from the well."

196.  This statement, which caused BP Ordinary Shares to trade at an inflated price, was false and misleading because Defendants knew or should have known that 5,000 bopd was not, in fact, a reasonable estimate given the information that was then available to them.  As of the date of this statement, Defendants had a number of competing estimates showing considerably higher spill rates, and even the document that Defendants relied upon in setting forth the 5,000 bopd estimate showed that the spill rate was potentially as high as 14,288 bopd. (¶¶130-132; 135(a)-(b); 146.6).  At a minimum, BP failed to disclose material information that was necessary to make this statement regarding the estimated spill rate not misleading. Defendants' specific knowledge of contradictory data made it unreasonable for them to rely wholly upon the 5,000 bopd estimate, and BP was incentivized to minimize the spill rate in order to reduce its liability.  *See* §IV.H, *supra*.

197.  In the SEC proceedings described in §IV.I, *supra*, BP admitted that this statement constituted a violation of Section 10(b) of the Exchange Act and Rule 10b, and that "BP knew, or was severely reckless in not knowing, the above-mentioned filings with the Commission and statements to the public contained material misrepresentations and omissions."

### R.  MAY 5, 2010 PRESS STATEMENT

198.  On May 5, 2010, in an interview with journalists from the HOUSTON CHRONICLE at BP's offices in Houston, Defendant Hayward again reiterated the misleadingly low oil flow

rates that BP had been promulgating, stating, "A guesstimate is a guesstimate.   And the guesstimate remains 5,000 barrels a day."

199.    Hayward admitted that the previous day, a BP executive had told "lawmakers in a closed-door briefing in Washington that the damaged well could hypothetically spew 60,000 barrels per day."  Hayward, however, downplayed the significance of these estimates, stating that the higher figure was "deeply theoretical" and represented an "absolute worst-case scenario."

200.    This statement, which caused BP Ordinary Shares to trade at an inflated price, was false and misleading because Defendants knew that 5,000 bopd was not, in fact, a reasonable estimate given the information that was then available to them.  As of the date of this statement, Defendants had a number of competing estimates showing considerably higher spill rates, and even the document that Defendants relied upon in setting forth the 5,000 bopd estimate showed that the spill rate was potentially as high as 14,288 bopd.  (¶¶130-132; 135(a)-(b); 146.6)  At a minimum, Defendants failed to disclose material information that was necessary to make this statement regarding the estimated spill rate not misleading.  Defendants' specific knowledge of contradictory data made it unreasonable for them to rely wholly upon the 5,000 bopd estimate, and Defendants were incentivized to minimize the spill rate in order to reduce BP's liability.  *See* §IV.H, *supra*.

### S.    MAY 14, 2010 PRESS STATEMENTS

201.    On May 14, 2010, on CNN.com, BP again asserted that 5,000 barrels per day was the best estimate available and disputed a claim by a Purdue University professor that the flow rate was as high as 70,000 barrels per day.  Defendant Dudley, who at that time was BP's Managing Director, claimed that the 70,000 barrel-per-day figure was "not accurate at all" and "isn't anywhere I think within the realm of possibility now."

202.    Also on that date, Defendant Suttles returned to ABC's 'Good Morning America' to discuss the spill again.  He represented that, "[O]urselves and the people from NOAA and others believe that *something around 5,000, that's actually barrels a day, is the best estimate.*"

203.    Defendant Suttles also returned to NBC's 'Today Show' on that date, where the following exchange occurred:

Q: "But is it possible that you are actually leaking more than 5,000 barrels a day?

Yes or no."

A: "I think, Ann, it could be higher or lower.  I don't think it is wildly different

than that number . . . it could be a bit above or below."

204.    These statements, which caused BP Ordinary Shares to trade at an inflated price, were false and misleading because Defendants knew or should have known that 5,000 bopd was not, in fact, a reasonable estimate given the information that was then available to them.  As of the date of these statements, Defendants had a number of competing estimates showing considerably higher spill rates, and even the document that Defendants relied upon in setting forth the 5,000 bopd estimate showed that the spill rate was potentially as high as 14,288 bopd. (¶¶130-132; 135(a)-(f); 146.6)   At a minimum, Defendants failed to disclose material information that was necessary to make these statements regarding the estimated spill rate not misleading.  Defendants' specific knowledge of contradictory data made it unreasonable for them to rely wholly upon the 5,000 bopd estimate, and Defendants were incentivized to minimize the spill rate in order to reduce BP's liability.  *See* §IV.H, *supra*.

**T.    MAY 17, 2010 PRESS STATEMENT**

205.    On May 17, 2010, at a Unified Command press briefing, the following exchange occurred between Defendant Suttles and a reporter:

Q: "You said that you're hoping that the riser tool could capture perhaps half the oil coming out, which I think you said is about 2,000 barrels.  Does that mean you know- you're certain how much is actually leaking and that it is about that 5,000 barrel figure we used to hear before?  Or, I mean, how do you know actually how much might be captured if you're not sure how much is actually coming out?"

A: "Well, how we'll know how much is captured is, we can actually meter it on board the drill ships.  So actually we can measure what's being recovered up there.  What we actually don't know is the exact rate on the seabed.  We've talked about this a great many times.  ***And that's our best estimate today.***  Clearly people are constantly asking that question.

206.    This statement, which caused BP Ordinary Shares to trade at an inflated price, was false and misleading because Defendants knew or should have known that 5,000 bopd was not, in fact, a reasonable estimate given the information that was then available to them.  As of the date of this statement, Defendants had a number of competing estimates showing considerably higher spill rates, and even the document that Defendants relied upon in setting forth the 5,000 bopd estimate showed that the spill rate was potentially as high as 14,288 bopd.  (¶¶130-132; 135(a)-(g); 146.6).    At a minimum, Defendants failed to disclose material information that was necessary to make this statement regarding the estimated spill rate not misleading.  Defendants' specific knowledge of contradictory data made it unreasonable for them to rely wholly upon the 5,000 bopd estimate, and Defendants were incentivized to minimize the spill rate in order to reduce BP's liability.  *See* §IV.H, *supra*.

## U.    MAY 19, 2010 CONGRESSIONAL STATEMENT

207.    On May 19, 2010, Defendant McKay appeared before the Committee on Transportation and Infrastructure.  When asked when "5,000 barrels per day [was] the most accurate" figure regarding the spill rate, he responded:

***That is our best estimate***.  Obviously, it's continually being looked at.  As you may know, we've gotten this riser insertion tube to work, and we're getting increased volumes at the surface where we can actually measure.  And then, I believe there is a new small task force that has been put together under direction of Unified Command to get all the experts together in a room and try to

understand, with the latest available data, is there a more accurate estimate?  But we do recognize there is a range of uncertainty around the current estimate.

208.   Later in the hearing, Representative Laura A. Richardson questioned BP as to why other reports contradicted BP's 5,000 barrels per day estimate, leading to the following exchange:

> Q: Why do you think there is a disagreement, and do you stand by your point that it is only 5,000?
>
> A: I think there are a range of estimates and it is impossible to measure.  That is the reality.  What we have been doing with government officials, government experts, industry experts, is trying to come up with the best estimate, and that has been done essentially by understanding what is happening at the surface and trying to understand volume there, adding to it what we believe the oil properties, how it would disperse in a water column as it moves to the surface.  And those two added together is the estimated volume.  It has been clear from day one there is a large uncertainty range around that.
>
> Q: Is it possible it could possibly be the larger number that has been reported?
>
> A: It is theoretically possible.  *I don't think anyone believes it is quite that high that has been working on this.  I believe the uncertainty range is around that 5,000 number, and it could be higher.  But if the number you are talking about is 70,000 barrels a day, I don't know this, but I don't think people that are working with it believe that is a possibility.*

209.   These statements, which caused BP Ordinary Shares to trade at an inflated price, were false and misleading because Defendants knew or should have known that 5,000 bopd was not, in fact, a reasonable estimate given the information that was then available to them.  As of the date of these statements, Defendants had a number of competing estimates showing considerably higher spill rates, and even the document that Defendants relied upon in setting forth the 5,000 bopd estimate showed that the spill rate was potentially as high as 14,288 bopd.  (¶¶130-132; 135(a)-(h); 146.6)   At a minimum, Defendants failed to disclose material information that was necessary to make these statements regarding the estimated spill rate not misleading.  Defendants' specific knowledge of contradictory data made it unreasonable for

them to rely wholly upon the 5,000 bopd estimate, and Defendants were incentivized to minimize the spill rate in order to reduce BP's liability. *See* §IV.H, *supra*.

### V.    MAY 21, 2010 PRESS STATEMENTS

210.    On May 21, 2010, Defendant Suttles returned again to ABC's 'Good Morning America,' where the following exchange occurred:

> Q: "People have really had enough of this.  You know, initially, you were saying 5,000 barrels were leaking.  Now we can see for ourselves that it's far more than that.  Could be – approaching 100,000.  Did you deliberately underestimate the size of the spill and mislead the public?"
>
> A: "Robin, you know, from the beginning, we've, we, we've worked with the government on this estimate.  In fact, I should actually point out that the 5,000 barrels a day . . . That was not just BP's estimate.  That was the estimate of the Unified Command, including NOAA and the Coast Guard.  **And that's the best estimate we have**.  We can't put a meter on this thing.  We can see what you can see.  We can see what's on the surface. . . ."

211.    Also on that date, at a Unified Command press briefing, Defendant Suttles stated, "[W]e have done analysis since the beginning about what we believe the rate is and we've talked about that on numerous times.  And we've said since quite early on that in this that ***our best estimate was somewhere around 5,000 barrels a day . . . So at the moment, that's our best estimate.***"

212.    These statements, which caused BP Ordinary Shares to trade at an inflated price, were false and misleading because Defendants knew or should have known that 5,000 bopd was not, in fact, a reasonable estimate given the information that was then available to them.  As of the date of this statement, Defendants had a number of competing estimates showing considerably higher spill rates, and even the document that Defendants relied upon in setting forth the 5,000 bopd estimate showed that the spill rate was potentially as high as 14,288 bopd. (¶¶130-132;  135(a)-(h);  146.6).    At a minimum, Defendants failed to disclose material information that was necessary to make these statements regarding the estimated spill rate not

misleading.  Defendants' specific knowledge of contradictory data made it unreasonable for them to rely wholly upon the 5,000 bopd estimate, and Defendants were incentivized to minimize the spill rate in order to reduce BP's liability.  *See* §IV.H, *supra*.

### W.   MAY 22, 2010 PRESS STATEMENTS

213.   On May 22, 2010, Defendant Suttles was interviewed on NPR's 'Weekend Edition,' during which the following exchanges occurred:

Q: And how much oil is billowing into the Gulf right now?

A: Well, Scott, I precisely don't know.  We've been trying to estimate the flow since very early on in the spill, and when I say we, it's actually BP, NOAA, the Coast Guard and others.  We can monitor what comes out of that pipe, but that's visual.  It's very difficult to measure that.  There's no meter.  But what we can also do is actually look at the expression of it on the surface, 'cause we can use aerial techniques to try to map how much oil is there and then see how much we collect or burn and the other techniques and look at the difference  ***And those are the techniques we use to give an estimate, and 5,000 barrels a day was the best estimate we could do . . .***

Q: Now – there's independent scientists who've made their own estimates at NPR's request, and they've come up with a substantially higher figure than 5,000.  They say as much as 70,000 barrels a day.

A: ***I've heard those estimates and seem them and I don't believe it's possible that it's anywhere near that number . . .*** since I can't meter it, I can't actually say it couldn't be.  ***But all our techniques would say that that's highly unlikely.***  And I think some of the reasons these estimates may not be able to accurately calculate that is there's a large volume of gas coming out of the end of the pipe with the oil.  And in addition to that, we, particularly over the last few days, when we've had good weather, we've actually seen the size of the spill and the amount of oil on the surface go down.  ***So those are the things that lead me to believe that those estimates are way too high.***

Q: What I'm trying to understand is if, and I will split the difference, but let's say that it's 30,000 barrels a day that are spilling- if you try to top kill – do you risk using a technique that could make the spill even worse?

A: No, I don't believe that's the case, Scott, and ***we don't think the rate's anywhere near that high.***

214.     This statement, which caused BP Ordinary Shares to trade at an inflated price, was false and misleading because Defendants knew or should have known that 5,000 bopd was not, in fact, a reasonable estimate given the information that was then available to them.  As of the date of this statement, Defendants had a number of competing estimates showing considerably higher spill rates, and even the document that Defendants relied upon in setting forth the 5,000 bopd estimate showed that the spill rate was potentially as high as 14,288 bopd. (¶¶130-132; 135(a)-(i); 146.6).   At a minimum, Defendants failed to disclose material information that was necessary to make this statement regarding the estimated spill rate not misleading.  Defendants' specific knowledge of contradictory data made it unreasonable for them to rely wholly upon the 5,000 bopd estimate, and Defendants were incentivized to minimize the spill rate in order to reduce BP's liability.  *See* §IV.H, *supra*.

## VI.     DEFENDANTS ACTED WITH SCIENTER

### A.     HAYWARD

215.     Statements A through L and R (¶¶148-81; 198-200) are attributable to Defendant Hayward.  At the time that each of these statements were made, Hayward either knew that these statements were false and misleading, or at a minimum, made such statements with recklessness as to their truth or falsity.  The facts demonstrating Hayward's scienter include that:

a)      As a member of GORC (a committee convened specifically to oversee and shepherd the OMS implementation project) and the executive liaison to SEEAC, Hayward received regular reports, including the quarterly Orange Book report, regarding BP safety metrics and the implementation of OMS, and a February 2009 report indicating that OMS had not completed the transition to OMS by the end of 2008.  *See* ¶¶32; 65-69, *supra*.

b)      As a member of GORC, Hayward reviewed and approved the structure of OMS, which explicitly contemplated that it would not be uniformly implemented on projects that were not owned and operated by BP.  John Mogford, BP's former Global Head of Safety & Operations, and a GORC member, has testified that GORC members knew of this limitation because they discussed it and approved its documentation.  *See* ¶¶73(a)-(b), *supra*.

c)      Hayward himself has testified that the Gulf of Mexico operations did not even "begin the process of cutover" to OMS until the fall of 2009, and did not anticipate that implementation would be complete until the end of 2010.  *See* ¶¶74-75, *supra*.

d)      Hayward has also testified that he was aware that BP did not have its own well control procedures in place on the *Deepwater Horizon* because it was owned by a contractor, such that he knew that OMS process safety procedures were generally not applied to contractor-owned rigs.  *See* ¶¶73(a); 74 *supra*.

e)      Hayward signed Sarbanes-Oxley certifications to BP's annual reports filed on Form 20-F, attesting to the accuracy and completeness of the information presented therein.  *See* ¶¶70-71, *supra*.

f)      Hayward was the public face of BP's supposed safety reform initiative and repeatedly made strong and sweeping statements regarding the progress and scope of the OMS initiative, such that if Hayward made the challenged statements regarding safety and OMS without actual knowledge that they were false, it was, at a minimum, reckless for him not to have informed himself on the true facts. *See* ¶¶148-81; 198-200, *supra*.

g)  At the time Hayward's statement regarding the Macondo well spill rate was made (Statement R), BP had numerous conflicting internal estimates demonstrating that the spill rate was potentially much higher than the 5,000 bopd estimate that the company was promulgating, making it unreasonable for the company to rely upon the 5,000 bopd figure without elaboration.  (¶¶130-132; 135(a)-(b); 146.6).  By publicly speaking on a matter that was critical to investors and the public, Hayward took on a duty to educate himself as to the true state of affairs.  Hayward was either aware of the competing internal estimates that made it unreasonable for him to rely on the 5,000 bopd figure, or was reckless for not being so aware.

## B.  SUTTLES

216.  Statements O, S, T, V and W (¶¶188-90; 202-03; 205-06; 210-14) are attributable to Defendant Suttles.  At the time that these statements were made, Dudley either knew that they were false and misleading, or at a minimum, were reckless as to their truth or falsity.  At the time his statements regarding BP's spill rate was made, BP had numerous conflicting internal estimates demonstrating that the spill rate was potentially much higher than the 1,000 - 5,000 bopd range that the company was promulgating, such that it was unreasonable for the company to rely upon the 1,000 - 5,000 bopd range without elaboration.  By publicly speaking on a matter that was critical to investors and the public, Suttles took on a duty to educate himself as to the true state of affairs.  Suttles was either aware of the competing internal estimates that made it unreasonable for him to rely on the 1,000 - 5,000 bopd range, or was reckless for not being so aware.  At the time that each of these statements were made, Suttles either knew that these statements were false and misleading, or at a minimum, made such statements with recklessness as to their truth or falsity.  Additional facts demonstrating Suttles' scienter include that:

86

a)       Suttles was one of the top BP officials involved in coordinating the spill response, including both on-the-scene efforts at spill containment and BP's media response, and according to the Presidential Commission was the counterpart of the federal on-scene coordinator.

b)       Suttles had access to both BP's spill estimate, dated April 26, 2010, providing an estimate of "roughly 5,000" bopd and the internal BP document dated April 27, 2010, showing estimated spill rates ranging between 1,063 bopd and 14,266 bopd. Nonetheless, on April 28, 2010, Suttles gave an estimate of only 1,000 bopd, and subsequently provided the public with a "best estimate" of "somewhere between one and five thousand" bopd.  (¶¶188-89)

## C.       DUDLEY

217.     Statement S (¶201) is attributable to Defendant Dudley.  At the time that this statement was made, Dudley either knew that it was false and misleading, or at a minimum, was reckless as to its truth or falsity.  At the time his statement regarding BP's spill rate was made, BP had numerous conflicting internal estimates demonstrating that the spill rate was potentially much higher than the 5,000 bopd estimate that the company was promulgating, such that it was unreasonable for the company to rely upon the 5,000 bopd figure without elaboration.  (¶¶130-132; 135(a)-(f); 146.6)  By publicly speaking on a matter that was critical to investors and the public, Dudley took on a duty to educate himself as to the true state of affairs.  Dudley was either aware of the competing internal estimates that made it unreasonable for him to rely on the 5,000 bopd figure, or was reckless for not being so aware.

## D.       GROTE

218.     Statement N (¶¶ 186-87) is attributable to Defendant Grote.  At the time that this statement was made, Grote either knew that it was false and misleading, or at a minimum, was

87

reckless as to its truth or falsity.  At the time his statement regarding BP's spill rate was made, BP had numerous conflicting internal estimates demonstrating that the spill rate was potentially much higher than the 1,000 bopd estimate that the company was promulgating, such that it was unreasonable for the company to rely upon the 1,000 bopd figure without elaboration.  (¶¶130-132; 146.6)  By publicly speaking on a matter that was critical to investors and the public, Grote took on a duty to educate himself as to the true state of affairs.  Grote was either aware of the competing internal estimates that made it unreasonable for him to rely on the 1,000 bopd figure, or was reckless for not being so aware.

### E.   MCKAY

219.   Statement U (¶¶ 207-08) is attributable to Defendant McKay.  At the time that this statement was made, McKay either knew that it was false and misleading, or at a minimum, was reckless as to its truth or falsity.  At the time his statement regarding BP's spill rate was made, BP had numerous conflicting internal estimates demonstrating that the spill rate was potentially much higher than the 5,000 bopd estimate that the company was promulgating, such that it was unreasonable for the company to rely upon the 5,000 bopd figure without elaboration.  (¶¶130-132; 135(a)-(h); 146.6)  By publicly speaking on a matter that was critical to investors and the public, McKay took on a duty to educate himself as to the true state of affairs.  McKay was either aware of the competing internal estimates that made it unreasonable for him to rely on the 5,000 bopd figure, or was reckless for not being so aware.

### F.   BP

220.   Statements A through W (¶¶148-214) are all attributable to Defendant BP.  Each of these statements were either made in BP filings, or were made by high-ranking BP personnel speaking in their official functions and on the company's behalf.  As discussed in §§VI.A-E, *supra*, statements A through H, J through O, and R through W (¶¶ 148-169, 174-190 & 198-214)

were each made by BP executives who knew that the statements were false or made them recklessly. Statements I, P and Q (¶¶170-73 & 191-97) were unsigned statements contained within BP's SEC filings. At the time that each of these statements were made, the BP personnel who drafted them either knew that these statements were false and misleading, or at a minimum, made such statements with recklessness as to their truth or falsity. Additional facts demonstrating BP's corporate scienter include that:

a)   In the SEC proceedings described in §IV.I, *supra*, BP admitted that Statements P and Q constituted violations of Section 10(b) of the Exchange Act and Rule 10b, and that "BP knew, or was severely reckless in not knowing, the above-mentioned filings with the Commission and statements to the public contained material misrepresentations and omissions."

b)   In the criminal proceedings described in §IV.J, *supra*, BP pled guilty to lying to Congress with respect to spill rates, and that a BP vice president whose knowledge was attributable to BP knew of higher estimates, including a worst-case estimates of up to 100,00 bopd that he knew of as early as April 21, 2010.

## VII. LOSS CAUSATION

221.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs. Throughout the relevant period, the market prices of BP Ordinary Shares were inflated as a result of Defendants' false statements and omissions, which led investors to believe that BP had more robust safety protocols in effect than was actually the case, and (after the accident) to underestimate the amount of oil that was spilling into the Gulf of Mexico. When the truth became known, the prices of BP securities declined precipitously as the artificial inflation was removed from the prices of these securities, causing substantial damage to Plaintiffs.

222.     On April 20, 2010, immediately prior to the explosion at the *Deepwater Horizon* (which occurred after the close of trading), BP's Ordinary Shares were trading at 655 GBp.  At all times relevant to this action, BP's ADS traded at a price virtually identical to the price of their Ordinary Shares (but denominated in dollars rather than GBp), and were affected in the same way as new information came to the market's attention.

223.     As investors came to understand that BP's Gulf of Mexico operations were still vulnerable to the same sort of risks and deficient process safety procedures that had infamously befallen BP's Texas City refinery, despite BP's assurances that it was focusing on safety and implementing the Baker Report recommendations across the Company, the price of BP Ordinary Shares dropped precipitously.

224.     On April 26, 2010, officials announced that attempts to stop the spill had failed and oil was flowing into the Gulf of Mexico.  This news caused BP Ordinary Shares to fall from 639 GBp on Friday, April 23 to 626 GBp on Monday, April 26, 2010, a decline of 13 GBp per Ordinary Share.

225.     On April 29, 2010, NOAA increased its estimate regarding the amount of oil that was spewing into the Gulf of Mexico from 1,000 to 5,000 bopd, causing BP Ordinary Shares to fall from 625 GBp to 584 GBp, a decline of 141 GBp per Ordinary Share.

226.     On May 3, 2010, BP admitted responsibility for the ongoing disaster, causing the price of BP Ordinary Shares to fall from 575 GBp per Ordinary Share on Friday, April 30, 2010 to 558 GBp on Tuesday, May 4, 2010 (Monday, May 3, had been a U.K. bank holiday), a decline of 17 GBp per Ordinary Share.

227.     On May 24, 2010, BP announced that the estimated costs for remediating the oil spill to date had more than doubled to $760 million, and that the Company was capturing less oil

than it projected.  On this news, the price of the Company's Ordinary Shares fell from 506 GBp on Friday, May 21, 2010 to 493 GBp on Monday, May 24, 2010, a 13 GBp decline.

228.     On May 27, 2010, the Flow Rate Technical Group published its first estimate of the oil spill flow rate, stating, "The only range of flow rates that is consistent with all 3 of the methods considered by the FRTG is 12,000 to 19,000 barrels per day," and that higher flow rates were possible.  In reaction to this news, the price of BP Ordinary Shares sank by approximately 5%, dropping from 520 GBp on May 27 to 494 GBp on May 28, a loss of 26 GBp per Ordinary Share.

229.     On Saturday, May 29, 2010, while trading markets were closed, BP revealed that the "top kill" procedure intended to halt the flow of oil had failed.  On that same day, the NEW YORK TIMES published an article entitled *Documents Show Early Worries About Safety of Rig*, reporting that "[i]nternal documents from BP show that there were serious problems and safety concerns with the Deepwater Horizon rig far earlier than those the company described to Congress last week."  On the next day, Sunday, May 30, 2010, Defendant Dudley attempted to distance BP from its earlier estimates of the volume of the spill, claiming, "Well, the estimates of the well rates have never been BP estimates.  They have always been through the unified command center."  On these disclosures, the price of Company's Ordinary Shares fell from 494 GBp on Friday May 28, 2010 to 430 GBp on Tuesday, June 1, 2010, a decline of 64 GBp per Ordinary Share or approximately 13%.

230.     As the disaster unfolded, the government exerted pressure on BP to cut shareholder dividends.  For example, on June 4, 2010, a NEW YORK TIMES article entitled "Obama Warns BP On Paying Big Dividends Amid Oil Spill" reported that the President had said, "[W]hat I don't want to hear is, when they're spending that kind of money on their

shareholders . . . that they're nickel-and-diming fishermen or small businesses here in the Gulf who are having a hard time."  On June 9, 2010, the ASSOCIATED PRESS reported that "[s]hares in BP PLC fell further on Wednesday [June 9, 2010] amid fears the British oil company will bow to U.S. political pressure to cut dividends to help pay for the Gulf of Mexico oil spill disaster."  The Company's Ordinary Shares fell from 408 GBp on June 8, 2010 to 391 GBp on June 9, a decline of 17 GBp per Ordinary Share or approximately 4%.

231.    On June 14, 2010, BP's Board of Directors officially met to discuss halting the Company's dividend payments as a result of Gulf of Mexico-related liabilities.  On this news, the Company's Ordinary Shares fell from 391 GBp on Friday, June 11, 2010 to 355 GBp on Monday, June 14, 2010, a decline of 36 GBp per Ordinary Share or approximately 9%.

232.    In total, from April 28, 2010 through June 14, 2010, the Company's Ordinary Shares fell in value by 46%, destroying over *$90 billion* in market capitalization.

233.    Defendants materially misstated the extent to which their post-Texas City safety reforms had been implemented, and the rate at which oil was spilling from the Macondo well into the Gulf of Mexico.  At all relevant times, it was entirely foreseeable to Defendants that the materialization of the risks they were concealing would cause significant harm to their investors.  Defendants' conduct, as alleged herein, proximately caused foreseeable losses and damages to Plaintiffs.

## VIII.  PLAINTIFFS RELIED ON DEFENDANTS' MISREPRESENTATIONS TO THEIR DETRIMENT

234.    Plaintiffs purchased BP Ordinary Shares at market prices between November 7, 2007, the date of the first misrepresentation challenged in this action, and May 27, 2010.  As discussed below, Plaintiffs relied on Defendants' misrepresentations when purchasing BP Ordinary Shares during this period.

## A. PLAINTIFFS RELIED ON DEFENDANTS' PRE-SPILL MISREPRESENTATIONS REGARDING SAFETY REFORMS

235.     Plaintiffs purchased BP Ordinary Shares in various mutual or special funds that they actively managed.  Plaintiffs employed internal investment analysts and researchers, as well as outside portfolio managers, to manage these funds and make investment decisions.  When making investment decisions regarding BP Ordinary Shares, these investment analysts reviewed and relied upon publicly available information regarding and published by BP, including its SEC filings, third-party analyst reports, BP press conference statements, and BP-related news articles.

236.     Prior to the *Deepwater Horizon* spill, Plaintiffs' investment personnel met with BP personnel on various occasions to discuss the company and its economic prospects and performance.  Plaintiffs' investment personnel also participated in analyst conferences and investor calls at which BP's performance, outlook, and the risks facing the company were discussed.

237.     Plaintiffs kept track of safety-related information regarding BP and incorporated such information into their analyses of the value of BP Ordinary Shares.  Plaintiffs were aware of the Baker Report and specifically referenced it in an internal scoring update dated February 7, 2007.  Plaintiffs believed that the Baker Report's recommendations would be implemented by BP and would have a positive impact on the value of BP Ordinary Shares, and that the new CEO, Defendant Hayward, would bring about changes in the strategy and culture of BP.  Plaintiffs also factored BP safety lapses, including the *Thunder Horse* near-upset and the damage to BP's Alaskan pipelines, into internal scoring updates dated September 18, 2007 and November 12, 2008.

238.    BP's representations and promises regarding process safety reforms as well as OMS were material to Plaintiffs' investment decisions.  Plaintiffs believed in and relied upon Defendants' safety-related statements when analyzing the risks that BP Ordinary Shares presented and determining whether to buy, hold or sell the stock at prevailing market prices. Plaintiffs relied upon each of the representations listed in §§V.A-L, *supra*, when making the decision to purchase BP Ordinary Shares between November 7, 2007 and April 20, 2010. Plaintiffs would not have purchased BP Ordinary Shares during this time period, or at a minimum would not have purchased them at the prices they paid, had they known that the representations listed in §§V.A-L were false.

### B.    PLAINTIFFS RELIED ON DEFENDANTS' POST-SPILL MISREPRESENTATIONS REGARDING THE SIZE OF THE SPILL

239.    After the spill, Plaintiffs closely monitored BP's statements regarding the spill and its volume, as well as spill-related developments in the media, and the progress of efforts to stop or contain the spill.  Plaintiffs' investment personnel prepared an internal scoring update, dated April 29, 2010, stating that:

> The near term focus remains on containing the Macondo (Gulf of Mexico) spill. Although the incident is undoubtedly serious and regrettable, we do not see it materially impacting BP's outlook. We have incorporated $1.7 bn of costs in our model which we consider the upper end of the potential costs on the information available for the time being".

240.    BP's expected spill-related liabilities (which were determined, in large part, by the volume of the spill) were thus a material factor in Plaintiffs' analysis of the value of BP Ordinary Shares.  In making their investment decisions, Plaintiffs and the investment personnel acting on their behalf relied upon the spill estimates that Defendants provided and trusted that Defendants would be truthful about these important matters.

241.     Defendants' misrepresentations regarding the volume of the oil spill caused Plaintiffs to substantially underestimate BP's likely liabilities and the environmental costs that BP would incur.   After the FTRG's corrective disclosures on May 27, 2010, Plaintiffs re-evaluated BP's anticipated spill-related costs in an internal scoring update dated June 1, 2010, now estimating the sum of all direct costs to be about $22 billion.

242.     Plaintiffs relied upon each of the representations listed in §§V.M-W, *supra*, when making the decision to purchase BP Ordinary Shares between April 24, 2010 and May 27, 2010. Plaintiffs would not have purchased BP Ordinary Shares during this time period, or at a minimum would not have purchased them at the prices they paid, had they known that the representations listed in §§V.M-W were false.

## IX.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

243.     The PSLRA's statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and/or misleading statements pleaded in this Complaint.

244.     None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

245.     To the extent that any materially false and/or misleading statement, alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.   As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures

made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

246.    To the extent that the statutory safe harbor may apply to any materially false and/or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false and/or misleading forward-looking statement because at the time such statement was made, the speaker actually knew the statement was false, or the statement was authorized and/or approved by an executive officer of BP who actually knew that the statement was false.

247.    Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading because they did not disclose that the risks that were the subject of such warnings had materialized and/or Defendants had actual knowledge of undisclosed material adverse facts that rendered such "cautionary" disclosures materially false and/or misleading.

## X.    CAUSES OF ACTION

### COUNT I

**For Common Law Fraud
With Regard To BP Ordinary Shares
Against All Defendants**

248.    Plaintiffs reallege each and every allegation contained above as if fully set forth herein.  This claim is brought against all Defendants under the common law.

249.    Defendants promoted and sold BP Ordinary Shares to Plaintiffs pursuant to the false and misleading statements identified in §V, *supra*.  Defendants made untrue statements of material facts regarding BP's safety procedures and the amount of oil being spilled from the Macondo well, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

250.     Each of the Defendants knew their representations and omissions were false and/or misleading at the time they were made or at the very least, recklessly made such representations and omissions without knowledge of their truth or falsity.   Furthermore, Defendants' statements regarding their safety procedures related to their own acts and omissions. Each of the Defendants made the misleading statements with intent to defraud investors, including Plaintiffs.

251.     Defendants intended that Plaintiffs would rely on their statements, and they encouraged such reliance through their representations to Plaintiffs.  Defendants' representations were directed towards Plaintiffs, and were made under circumstances such that the natural consequences of those statements would be to induce reliance from Plaintiffs.  Defendants knew or recklessly disregarded that Plaintiffs would rely upon their representations in connection with their decision to purchase BP Ordinary Shares.  Defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

252.     Plaintiffs reasonably, justifiably and foreseeably relied on Defendants' false representations and misleading omissions.  *See* §VIII, *supra*.

253.     It was only by making such representations that Defendants were able to induce Plaintiffs to purchase BP ADS and Ordinary Shares.  Plaintiffs would not have purchased or otherwise acquired BP Ordinary Shares, or at a minimum would only have purchased them at a lower price, but for Defendants' fraudulent representations and omissions about their safety procedures and the magnitude of the *Deepwater Horizon* oil spill.

254.     Had Plaintiffs known the true facts regarding these matters, including that the Defendants' supposed safety reforms were far less comprehensive than had been represented and

that after April 20, 2010 BP grossly understated its estimates of the oil spill, Plaintiffs would not have purchased BP Ordinary Shares at the prices at which they were offered.

255.    As a result of Defendants' false and misleading statements and omissions, Plaintiffs suffered damages in connection with their purchases of BP Ordinary Shares.

256.    Because Defendants committed these acts and omissions maliciously, wantonly and oppressively, and because the consequences of these acts knowingly affected the general public, including but not limited to all persons with interests in BP Ordinary Shares, and all persons living around or dependent upon the Gulf of Mexico, Plaintiffs are entitled to recover punitive or exemplary damages.

257.    In the alternative, Plaintiffs hereby demand rescission and makes any necessary tender of their BP Ordinary Shares.

<u>COUNT II</u>

**For Violations of the Financial Services and Markets Act 2000**
**With Regard To BP Ordinary Shares**
**Against BP**

258.    Plaintiffs reallege each and every allegation contained above as if fully set forth herein.  This claim is brought against Defendants under Section 90A of the Financial Services and Markets Act 2000 (the "FSMA").

259.    BP Ordinary Shares, as securities traded on the London Stock Exchange, are securities to which Section 90A applies.  BP is the issuer of BP Ordinary Shares.

260.    Defendants promoted and sold BP Ordinary Shares to Plaintiffs pursuant to the false and misleading statements identified in §V, *supra*.  Defendants made untrue statements of material facts regarding the amount of oil being spilled from the Macondo well, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

98

261.     BP management and executives with responsibility for the challenged statements knew their representations and omissions were false and/or misleading at the time they were made or at the very least, recklessly made such representations and omissions without knowledge of their truth or falsity.  Furthermore, the Defendants' statements regarding the oil spill related to their own acts and omissions.  Each of the Defendants made the misleading statements with intent to defraud investors, including Plaintiffs.

262.     Defendants intended that Plaintiffs would rely on their statements, and they encouraged such reliance through their representations.  Defendants' representations were directed towards Plaintiffs and other BP investors, and were made under circumstances such that the natural consequences of those statements would be to induce reliance from Plaintiffs. Defendants knew or recklessly disregarded that Plaintiffs would rely upon their representations in connection with its decision to purchase BP Ordinary Shares.  Defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

263.     Plaintiffs reasonably, justifiably and foreseeably relied on Defendants' false representations and misleading omissions.  *See* §VIII, *supra*.

264.     It was only by making such representations that Defendants were able to induce Plaintiffs to purchase BP Ordinary Shares.  Plaintiffs would not have purchased or otherwise acquired BP Ordinary Shares, or at a minimum would only have purchased them at a lower price, but for the Defendants' fraudulent representations and omissions about the magnitude of the *Deepwater Horizon* oil spill.

265.    Had Plaintiffs known the true facts regarding these matters, including that the Defendants grossly understated their estimates of the oil spill, Plaintiffs would not have purchased BP Ordinary Shares at the prices at which they were offered.

266.    As a result of Defendants' false and misleading statements and omissions, Plaintiffs suffered damages in connection with their purchases of BP Ordinary Shares.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

1.    Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

2.    Rescission and recovery of the consideration paid for BP ADS and Ordinary Shares, including interest thereon;

3.    Plaintiffs' costs and disbursements in this suit, including reasonable attorneys' fees and expert fees;

4.    Prejudgment interest at the maximum legal rate; and

5.    Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  April 18, 2014                              Respectfully Submitted,


                                                    /s/ Kent A. Schaffer
                                                    **BIRES SCHAFFER & DEBORDE**
                                                    Kent A. Schaffer
                                                    712 Main Street
                                                    Suite 2400
                                                    Houston, TX 77002
                                                    Telephone: (713) 574-9412
                                                    Facsimile: (713) 228-0034

kentschaffer@gmail.com

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Geoffrey C. Jarvis
485 Lexington Avenue
New York, NY 10017
Telephone:  (646) 722-8505
Facsimile:  (302) 622-7004
jeisenhofer@gelaw.com
gjarvis@gelaw.com

**DIAZ REUS & TARG LLP**
Alexander Reus
Miami Tower at International Place
100 S.E. Second Street, Suite 3400
Miami, FL 33131
Telephone: (786) 235-5000
Facsimile: (786) 235-5005
info@diazreus.com

*Counsel for Plaintiffs*